UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JULIE HARPER,

               Petitioner,

v.

MOLLY HILL, et al.,

               Respondent.

Case No.:  18cv01888-GPC-MDD

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETTITION FOR WRIT OF HABEAS CORPUS**

**[ECF Nos. 1, 2]**

     This Report and Recommendation is submitted to United States District Judge Gonzalo P. Curiel pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

     After reviewing the operative Petition for Writ of Habeas Corpus (ECF No. 1), Memorandum of Points and Authorities in Support of the Petition for Writ of Habeas Corpus (ECF No. 2), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF No. 7-1), Petitioner's Traverse (ECF No. 9-1), and pertinent state court lodgments, the

1

Court RECOMMENDS the Petition be DENIED for the reasons stated below.

# I. PROCEDURAL HISTORY

## A. Federal Proceedings

On August 15, 2018, Julie Harper ("Petitioner"), a state prisoner represented by her attorney, filed the Memorandum of Points and Authorities in Support of the Petition for Writ of Habeas Corpus. (ECF No. 2). Petitioner sets forth three claims: (1) improper denial of *Batson* motions; (2) improper jury instruction; and (3) ineffective assistance of counsel. (ECF No. 2). On November 20, 2018, Respondent Answered. (ECF No. 7-1). On December 31, 2018, Petitioner filed a Traverse. (ECF No. 9-1).

## B. State Proceedings

On October 8, 2015, the jury found Petitioner guilty of second degree murder pursuant to Cal. Penal Code § 187(a) ("Penal Code"). (ECF No. 8-2 at 197).[1] More specifically, the jury found that she personally and intentionally used and discharged a firearm, within the meaning of Penal Code §§ 12022.53(d) and 12022.5(a). (*Id*.). On January 15, 2016, the court sentenced Petitioner to state prison for 40 years to life, including 15 years to life for second degree murder and 25 years to life for personally discharging a firearm causing death. (ECF No. 8-3 at 31-32).

On January 15, 2016, Petitioner filed an appeal in the California Fourth District Court of Appeal raising the same three claims raised in this Petition as well as two other claims. (ECF No. 1 at 13-14). The two other claims asserted that: (1) the trial court erred by failing to instruct the jury that voluntary manslaughter can be based on imperfect self-defense because

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

the Petitioner used excessive force; and (2) the trial court improperly qualified the prosecution's expert on domestic partner abuse. (ECF No. 1 at 14-15). On January 5, 2018, the appellate court rejected Petitioner's contentions and affirmed the judgment, but remanded the matter to the trial court to conduct a new sentencing hearing. (ECF No. 1 at 15).

Then, Petitioner filed a petition in the California Supreme Court for review of the same three claims raised here. (ECF No. 2 at 9). On April 18, 2018, the California Supreme Court denied the petition without providing any reasoning or citations. (ECF No. 1 at 56).

## II. STATEMENT OF FACTS

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). Federal courts review the last reasoned decision from the state courts. *Id.* at 805-06. Accordingly, the following facts are taken from the appellate court's opinion:

*The Prosecution's Case*

On the morning of Tuesday, August 7, 2012, Jason and [Petitioner] argued in the master bedroom of their Carlsbad home while their three children, ages nine, seven and one, watched television downstairs. At that time, [Petitioner] and Jason had been married for close to 11 years. The couple's relationship had deteriorated significantly in the years leading up to that day and

18cv01888-GPC-MDD

had become exceptionally tense in the days immediately preceding. Jason had recently discovered [Petitioner] had taken $9,000 in credit card advances in his name without his knowledge. The argument that morning ended with [Petitioner] shooting and killing Jason with a gun she had hidden under her pillow. After the gun went off sometime before 9:00 a.m., the Harpers' older two children went upstairs to see what had happened. [Petitioner] opened the bedroom door slightly and told her nine-year-old son that Jason had fallen off a chair. [Petitioner] did not let the children into the room, instead telling them to go back downstairs.

[Petitioner] then told the children to get ready and took them to a nearby coffee shop they frequented. After getting coffee and pastries, [Petitioner] drove to a neighbor's home and asked if she could leave the children for a playdate. The neighbor was busy and said she could not watch them. [Petitioner] also called her younger sister, Amy Killpack, around the same time to see if she could watch the children. Killpack told [Petitioner] she was busy until the afternoon, but could watch them after 1:00 p.m. [Petitioner] then dropped off her two older children at a play gym where they had been in the past.

Jason's parents, Homer and Lina, resided in Glendale and had recently purchased a home in Carlsbad. The weekend before Jason's death, his parents were in Carlsbad doing repairs on their new home. Jason, [Petitioner] and the three children had been at the house for dinner the evening before the shooting. The morning of Jason's death, Homer and Lina expected Jason to come over with the children. When Lina had not heard from Jason by 9:30 a.m., she called his phone and left a message asking if he still needed their help with the kids and if he was okay. At 11:46 a.m., Jason's brother, Brian, who was also visiting and staying at Homer and Lina's house, received a text message from Jason's phone to "tell mom running errands…see her Friday." Brian relayed the message to his parents, and Lina and Homer, assuming everything was fine, drove home to Glendale.

Around noon, [Petitioner] returned to her house. She entered the gated community where the house was located through the guest entrance that was controlled by a keypad, rather than use her remote control for the resident entrance. At noon, a neighbor saw [Petitioner] "frantically putting things inside" her minivan while it was parked in the driveway of her

4

home. Around 1:00 p.m., [Petitioner] arrived at Killpack's house in University City with the three children. [Petitioner] left by herself, telling Killpack she needed to run an errand.

Around 3:00 p.m., [Petitioner] arrived at her father's real estate office near downtown San Diego. [Petitioner] told her father, John Cihak, that Jason was dead and that she had killed Jason in self-defense. Cihak called his personal attorney and told the attorney that he needed to get in touch with criminal defense attorney Paul Pfingst. Cihak's attorney called Pfingst and set up a meeting for 5:30 p.m. [Petitioner] remained with Cihak until the two drove to Pfingst's office separately. [Petitioner] met with Pfingst and then she and Cihak drove back to Cihak's office for Cihak to get a check for Pfingst's retainer.

Thereafter, [Petitioner] and Cihak picked up the children from Killpack's house and returned to Pfingst's office where Pfingst's investigator interviewed the two older children. [Petitioner], Cihak and the children then went to Cihak's house and the children went to bed. Around 11:00 p.m., Pfingst called the Carlsbad Police Department and asked them to check on the welfare of Jason at the Harpers' home. Officers searched the house and discovered Jason's body in the master bedroom. The medical examiner determined Jason was killed by a single gunshot that entered the back left side of his torso and went through his heart.

The following afternoon, the police arrived at Cihak's house and arrested [Petitioner]. [Petitioner] had no injuries on her body at the time she was taken into custody. Cihak took the children to Rady Children's Hospital and they were taken into protective custody. Police searched Cihak's home twice after [Petitioner's] arrest. The second time they discovered a backpack in the attic of Cihak's garage containing jewelry, credit cards, checks, a handgun and passports for [Petitioner] and the two older children. In addition, Cihak testified that before the police found the backpack he had removed over $30,000 in cash and given it to Pfingst at Pfingst's direction.

The prosecution put on several relatives and friends of the Harpers who testified that they never saw any sign of physical abuse or unexplained injuries on [Petitioner's] body, and that [Petitioner] never reported any abuse or acted afraid of Jason. The Harpers' two older children both testified that they had never

seen Jason hit [Petitioner], but that they had seen [Petitioner] strike Jason. The children did testify that their parents argued and that during arguments Jason used explicit language. Killpack testified that the month before Jason's death, [Petitioner] told her that Jason was physically abusing her, specifically that Jason had grabbed and twisted [Petitioner's] wrists and that it was extremely painful because of [Petitioner's] arthritic condition. [Petitioner] never told Killpack that she had been raped and Killpack never saw any physical injury on [Petitioner]. Cihak testified that at one point [Petitioner] told him she needed protection from Jason and that things were bad between them, but that [Petitioner] did not explain in any further detail.

*The Defense Case*

[Petitioner] took the stand in her own defense. She portrayed Jason as an abusive and controlling husband. She told the jury that his abusive behavior had begun in 2009. She stated that at that time, Jason would yell and scream at her in front of their children, criticize her weight and call her derogatory, explicit names. She also testified that she was suffering from severe pain from multiple, diagnosed inflammatory conditions related to rheumatoid arthritis, and that Jason was unsympathetic to her physical limitations. She alleged that over the years, Jason, a high school math teacher, had taken thousands of dollars from the couples' joint banking accounts and transferred it to accounts in his name only without her consent. She also testified that beginning in 2009 or 2010 Jason allowed her only $200 a month for all of her personal expenses and their children's expenses.

[Petitioner] told the jury that Jason raped her for the first time in January 2010 after Jason became upset about [Petitioner] spending money on the children and on her medical care. [Petitioner] testified that from that incident to Jason's death, he raped her approximately 30 times. [Petitioner] stated she kept a day planner in which she made notations of when she and Jason had sex and testified that some of the entries for sex were actually a code to herself to document rape. [Petitioner] also testified that she sent some of the planner entries to her former fiancé during this time frame.

On November 4, 2011, after an argument in front of the children that [Petitioner] described as particularly angry, the

6

Harpers' oldest child called the police. The police came to the house and Jason left for a few hours to cool down. No charges were pressed. [Petitioner] described the incident as a turning point in her marriage, and testified that after that day both she and Jason separately consulted attorneys about divorce. [Petitioner] described continued strife between them, but also explained that she attempted to reconcile the relationship in the spring of 2012. When [Petitioner's] attorney asked her why she stayed in the marriage despite what [Petitioner] described as almost constant abuse, she stated she had difficulty leaving because of her Catholic faith and her desire to keep the family together for the children. Because of her significant medical expenses, she also feared losing her health insurance.

On August 2, 2012, [Petitioner] filed for divorce. She testified that she did not report the abuse and rape she allegedly suffered because she feared Jason would lose his teaching job, which was the family's only source of regular income. [Petitioner] testified that the day after filing for divorce, she took a gun she kept in a safe in the house and hid it under her pillow. She stated she was afraid Jason would react violently to being served with the divorce papers. The month before, [Petitioner] had packed what she described as a "getaway bag" (the backpack later found by San Diego police in her father's house) in case she felt she could not safely stay in the family's home.

[Petitioner] testified that on the evening before Jason's death, after the couple had put the kids to bed, they argued about their marriage and finances. [Petitioner] stated that she was awoken the next morning by Jason throwing things on top of her and screaming about finding his computer, which [Petitioner] had moved. According to [Petitioner], Jason then angrily left the house and returned shortly after. When he returned, [Petitioner] admitted she had hidden Jason's computer under the bed and then told Jason she had filed for divorce. [Petitioner] testified Jason became "livid" and started shaking her and ripping off her clothes. [Petitioner] said she believed Jason was going to rape her and grabbed her gun from under her pillow and pointed it at him. [Petitioner] testified Jason then yelled "I'm going to kill you, you fucking bitch" and came after her. [Petitioner] told the jury the gun went off accidently and she ran into the bathroom to hide.

7

[Petitioner] saw that Jason was on the ground, and eventually went to check on him. She realized he was dead and covered him with a blanket. When the older children knocked on the bedroom door, she told them Jason had fallen off a chair. [Petitioner's] testimony of the rest of the day corroborated the testimony of the prosecution's witnesses. She testified that after her meeting with Pfingst she buried the gun she used to shoot Jason near her father's office. She said when she was released from custody, she went to find the gun and it was no longer there. On cross-examination, the prosecutor questioned [Petitioner] about the nature of her relationship with her former fiancé whom she had sent her planner entries to and whom she had kept in contact with throughout her marriage. [Petitioner] admitted that 17 days after she was taken into custody, she wrote to her ex-fiancé from jail and referred to him as the love of her life.

[Petitioner's] defense team also presented the testimony of two experts, a forensic criminologist who testified about accidental discharge of firearms in stressful situations and a psychologist specializing in intimate partner abuse. The psychologist, Dr. Mindy Mechanic, testified about the difficulty women who are being abused by their husbands face in leaving the relationship. Dr. Mechanic also testified about the stigma attached to telling other people about abuse that is occurring in a romantic relationship. Dr. Mechanic opined that [Petitioner] was abused by Jason, and that her behavior was consistent with that shown in research concerning victims of domestic violence.

### The Prosecution's Rebuttal

The prosecution offered the testimony of Dr. Daniel Martell, a forensic psychologist, to rebut Dr. Mechanic's testimony. Dr. Martell testified he had received training on domestic violence and had worked on over 1,000 cases that involved domestic violence in some respect. After the court qualified Dr. Martell as an expert on domestic abuse over the defense's objection, he gave his opinion that [Petitioner's] documentation of her behavior in her journal, which reflected a desire for more intimacy and sex with Jason, was the opposite of the behavior expected for someone who is being violently raped. He also noted that after [Petitioner] alleged the abuse began, she did things to antagonize Jason, a behavior

8

contrary to that expected from a domestic violence victim who would want to avoid further abuse.

*Verdict and Sentence*

After the conclusion of the trial, the jury found [Petitioner] guilty of second degree murder. The jury also found true the allegations that she personally and intentionally discharged a firearm that caused death within the meaning of section 12022.53, subdivision (d) and that she personally used a firearm within the meaning of section 12022.5, subdivision (a). The trial court sentenced [Petitioner] to 40 years to life, consisting of 15 years to life for murder and 25 years to life for the more serious firearm allegation.

## III.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under § 2254(d), federal habeas relief for a claim adjudicated on the merits in state court is granted if the state court adjudication of the claim either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

In other words, "if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2544(d)(1) and (2) applies." *Richter*, 562 U.S. at 103. "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings,

which demands that state-court decisions be given the benefit of the doubt[.]'" *Pinholster*, 563 U.S. at 181; *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014).

The state court's decision is "contrary to" clearly established federal law if it either "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (O'Connor, J., concurring)).

The state court's decision is "an unreasonable application" of clearly established federal law "if 'the state court identifies the correct governing legal principle' but applies the principle unreasonably to the prisoner's factual situation.*" Holley*, 568 F.3d at 1098 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Relief under § 2254(d)(1)'s "unreasonable-application clause" is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Woodall*, 134 S.Ct. at 1706-07 (quoting *Richter*, 562 U.S. at 103).

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *Woodall*, 134 S.Ct. at 1702 (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538

U.S. at 71-72. "Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed." *Holley*, 568 F.3d at 1097. As such, "[i]f there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law." *Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004).

Federal courts review the last reasoned decision from the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

## DISCUSSION

**A.    Claim One: Improper Denial of *Batson* Motions**

Petitioner contends that the trial court improperly denied her *Batson* motions and the appellate court improperly upheld the trial court's rulings. (ECF No. 9-1 at 1). Petitioner's *Batson* motions alleged that the prosecutor exercised gender-based peremptory challenges against four male jurors. (ECF No. 9-1 at 1).

### 1. State Court Opinion

Petitioner raised claim one in her petition for review to the state appellate and supreme courts. (ECF No. 2 at 9). The appellate court denied Petitioner's claim on the merits and the California Supreme Court denied the petition without comment or citation to authority. (ECF No. 1 at 33, 56). Accordingly, this Court must "look through" to the state appellate court's

opinion denying the claim as a basis for authority.  *Ylst.* 501 U.S. at 805-06.
That court wrote:

I

*Batson / Wheeler Motion*

[Petitioner] first contends that the prosecutor improperly
removed men from the jury because women were more likely to
favor the prosecution's theory of the case.  She asserts that four of
the prosecutor's challenges to male jurors were motivated by this
discriminatory purpose.  The Attorney General responds that the
prosecutor offered gender-neutral justifications for its
[peremptory] challenges each time [Petitioner's] attorney asserted
a prima facie case of discriminatory purpose, and substantial
evidence supports the trial court's conclusion that the prosecutor's
challenges were not biased.

A. *Relevant Background*

During voir dire, the prosecutor exercised his first three
[peremptory] challenges against men.  The defense then used a
[peremptory] challenge to excuse a woman, and the prosecutor
used its fourth [peremptory] challenge to excuse another man.
[Petitioner's] counsel then made its first motion under *Batson* and
*Wheeler*, asserting the prosecution was systematically excusing
jurors on the basis of their gender because posttrial questioning of
the jury in [Petitioner's] earlier trial revealed male jurors were
more likely to view [Petitioner's] actions as self-defense.  In
response, the court noted that the jury as currently constituted
had seven women and five men and that it did not find there had
been a systematic exclusion of men.  The court stated it would not
require the prosecution to present its reasons for excluding male
jurors, but at the prosecutor's request allowed him to provide his
rationale for the exclusion of each male juror.

The prosecutor explained he dismissed the first male juror,
J.L., because he had been late and was young and had little life
experience.  The prosecutor explained he had dismissed the second
male juror, J.Z., because he had quarreled with the prosecutor on
the concept of circumstantial evidence.  As to the third male juror,
E.A., the prosecutor stated the man had been late, had a brother
in prison, and as a TSA screener was not accustomed to decision
making in his job.  The prosecutor explained that he dismissed the

fourth male juror, S.E., because he was a professor of psychology and might not accept the testimony of the expert witnesses.

When voir dire resumed, the defense exercised its third [peremptory] challenge on a woman, the prosecutor exercised his fifth challenge on a woman, and the defense exercised its fourth challenge on a woman. The prosecution then exercised its sixth challenge to excuse another man, W.B., and the defense renewed its *Batson/Wheeler* motion. The court noted the current composition of the jury, four men and eight women, and that the defense had excused three women, then stated it found the defense had established a prima facie case of systematic exclusion of men based on their gender. The court indicated the prosecutor had justified its exclusion of the first four men, then asked for the justification for W.B. The prosecutor explained that W.B. was a "larger individual" that appeared to show signs of alcoholism or drug use, was disheveled in his appearance and sweating profusely, had rotting teeth, and also had worn the same pants for several days in a row. The prosecutor also stated that W.B. would not be favorable to the prosecution because he was a retired letter carrier.

The court accepted the prosecutor's justification for J.L., J.Z., E.A. and S.E. as gender-neutral, but challenged several of the prosecutor's justifications for excusing W.B. The court stated it was extremely hot in the courtroom and many of the people were sweating and wearing casual clothes because of the time of year. The court did not notice W.B. had rotting teeth or see signs of alcohol or drug abuse. The court concluded, however, that the prosecution's nongender related justifications were sufficient to show it was not systematically excluding jurors on the basis of gender.

The trial court then stated its understanding that there were "five people who voted not guilty" at the prior trial and "all were men." The prosecutor objected to the defense's characterization of the vote at the earlier trial, and stated it was not clear from his communications with the prior jury that men had generally favored the defense more than woman, and that it had been difficult to determine what the final vote had been. [Petitioner's] attorney then argued vehemently that it was clear that men on the prior jury had sided with the defense and that the district attorney's strategy was to put as few men on the jury as possible.

13

The court repeated its ruling that it was denying the defense motion, but stated it would continue to monitor the issue.

Jury selection resumed and the defense excused its fifth female juror and the prosecution used its seventh challenge to excuse another man, M.S. The defense again renewed its motion and the court again found a prima facie showing that the prosecution was systematically excusing men from the jury, and required the prosecutor to justify his exclusion of M.S. The prosecutor stated that while at first he wanted M.S. to remain on the jury, once M.S., without any prompting, "quarreled "with defense counsel "about the language of the presumption of innocence, "he became concerned about M.S. "being so technical." The court noted that the quarrel with defense counsel seemed to favor the prosecution, and that it had asked M.S. a follow-up question because it anticipated the defense might challenge the juror for cause. The prosecutor responded that because the crimes at issue were complicated and potentially involved jury instructions for second degree murder, implied and express malice, and voluntary and involuntary manslaughter, he did not "want a juror on there who is going to quarrel with every single definition."

After argument by [Petitioner's] defense counsel, the court denied the motion. However, the court noted that it would not characterize M.S.'s interaction with the defense counsel as a quarrel, but rather a discussion about the law. The court stated that there were "justifiable reasons to excuse some of the other" men, but that it was "finding the justifications to be less compelling" as the process continued and that "the ice is about as thin as it can get right now." The court then noted its difficulty with the decision, that it believed the decision was "a close call," and that it thought "a reviewing court [might] disagree with [its] ruling..." The defense then exercised its sixth challenge against a female juror. No further challenges were made and the trial court empaneled the jury.

## B. *Legal Standard*

Under *Wheeler*, "'the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.'" (*People*

*v. Catlin* (2001) 26 Cal.4th 81, 116.) As held by the United States Supreme Court in *Batson*, this practice also violates "'the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.'" (Ibid.) "Whether a *Wheeler* or a *Batson* claim . . . is raised, 'the defendant need not be a member of the group in question in order to complain.'" (Id. at pp. 116-117.)

In ruling on a motion challenging the exercise of peremptory strikes as improperly biased, "the trial court follows a three-step procedure. 'First, the [challenging party] must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the [other party] to explain adequately the . . . exclusion" by offering permissible [gender]-neutral justifications for the strikes. [Citations.] Third, "[i]f a [gender]-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination." [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 904.) A prima facie case is established "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California* (2005) 545 U.S. 162, 170.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

"We review the trial court's ruling on the question of purposeful . . . discrimination for substantial evidence. [Citation.]." (*People v. Avila* (2006) 38 Cal.4th 491, 541 (*Avila*).) A litigant's justification for a peremptory challenge need not rise to the level of a challenge for cause, and even a trivial reason or hunch, if genuine and neutral, will suffice. (*Lenix, supra,* 44 Cal.4th at p. 613.) "It is presumed that [counsel] uses peremptory challenges in a constitutional manner, and we give deference to the court's ability to distinguish 'bona fide reasons from sham excuses.' [Citation.] As long as the court makes 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' [Citation.] (*Avila*, at p. 541.)

C. *Analysis*

[Petitioner] challenges the denial of the motion with respect to four of the prospective male jurors: M.S., W.B., S.E. and J.Z. [Petitioner] asserts the trial court properly rejected several of the prosecutor's stated reasons for dismissing M.S. and argues that insufficient evidence supports the prosecutor's remaining rationales. As discussed, the prosecution's justification for excusing M.S. was that he had been antagonistic with [Petitioner's] attorney during voir dire and without any prompting had questioned the presumption of innocence. This led the prosecutor to think that M.S., an engineer by training, might derail deliberations by taking an overly technical view of the complicated legal questions the jury would be expected to tackle at the end of the trial. On appeal, the Attorney General expands on this argument, also asserting that because M.S. described himself as a fence sitter he might have also remained "overly neutral" and unwilling to take a position.

"A tendency toward equivocation is seldom the first quality sought in a prospective juror by the party bearing the burden of proof." (*People v. Lancaster* (2007) 41 Cal.4th 50, 76.) As the prosecutor stated during jury selection, the crimes at issue were complicated and involved jury instructions for second degree murder, implied and direct malice, and voluntary and involuntary manslaughter. We agree with the trial court that the prosecution's desire not to have a juror "who is going to quarrel with every single definition" was a gender-neutral rationale for excusing M.S., and the statements made by M.S. during voir dire supported the trial court's determination on this point.

[Petitioner] next challenges the prosecution's dismissal of W.B. from the jury. W.B. had delivered mail in Palm Desert for 30 years before retiring in San Diego County. The prosecutor's stated reasoning for excusing W.B. was that he was overweight and had a slovenly appearance, and also showed signs of having a substance abuse problem. The prosecutor also based his decision on the fact that W.B. was a postal worker. In denying the defense's motion with respect to W.B., the court noted it had been very hot in the courtroom and that other venire persons were also sweating and wearing casual clothing.

The court also noted that it did not notice anything about W.B. that suggested substance abuse. The court, however, accepted the

16

prosecution's justification. Because the court disagreed with the prosecution's argument concerning W.B.'s appearance, we agree with [Petitioner] that the only remaining proffered justifications for this court to consider are W.B.'s weight and his former job as a postal worker. We agree with the Attorney General, however, that these rationales were neutral and nondiscriminatory, and formed an appropriate basis for the prosecution's excusal of W.B. and the trial court's conclusion that the excusal was not improperly biased. (See *People v. Lomax* (2010) 49 Cal.4th 530, 575 ["a slovenly appearance can reveal characteristics that are legitimately undesirable to the prosecution"].)

S.E. was a psychology professor at Mira Costa College and had previously worked as a child abuse investigator in Orange County where he had been involved in the removal of children from their parents' homes because of domestic violence. S.E. did not have any formal psychology training in the field of domestic violence. The prosecutor's justification for dismissing S.E. was that as a professor in the field of psychology he would be less inclined to accept the opinions of the experts in the case and was likely to be liberal in a case with issues of domestic violence. The court accepted these reasons and denied the defense motion with respect to S.E.

On appeal, [Petitioner] contends that because S.E. taught psychology in the fields of research, statistics and human sexuality, and had no clinical training in the fields of the experts in the case, the prosecutor's rational was pretextual. [Petitioner] also points to another juror, a woman, with a background in psychology who was not excused. These arguments are not well taken. First, a potential juror's "educational background, interest, and experience in the field of psychology" may be a "neutral reason justifying his excusal." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 110.) The fact that S.E.'s field of study was not identical to that of the experts does not show the prosecution's justification was pretextual. As the Attorney General points out, S.E.'s profession and training "gave him uncommonly specialized knowledge" and this rationale for excusing him from the jury was gender-neutral.

The comparison with the female juror that was not excused by the prosecution also does not persuade us that the prosecutor's justification was pretextual. That juror worked in marketing and

design for a commercial real estate firm.  She stated she spent five years as a university student, which included some time studying computer information systems, social and cultural history, and psychology, but she never completed a degree in any field.  She also stated that she had worked in real estate for her entire career.  There is no evidence that this female juror had the same kind of specialized knowledge that E.S., a professor in the field of psychology, had.

Lastly, [Petitioner] asserts that the prosecution's excusal of J.Z. was improperly based on his gender.  J.Z. was an engineer who worked on autonomous vehicles for the military. J.Z. stated he was married, and his wife home-schooled their children.  During questioning by the prosecution, J.Z. raised concern with the concept of circumstantial evidence and said he was not sure he would feel comfortable convicting the [Petitioner] solely based on circumstantial evidence.  J.Z. stated he understood that everything is probabilistic and it would not be 100 percent either way, but the "probability would have to be very high in order to convict somebody of this type of thing."  He also stated he was surprised that the law makes no distinction between direct and circumstantial evidence and that he would "be interested to learn exactly what the law says on that."

When asked to provide his justification for excusing J.Z., the prosecutor explained that J.Z. was a "science-heavy person who quarreled with [him] on the concept of circumstantial evidence" and that he had concerns about J.Z.'s use of common sense.  The court accepted this justification, agreeing that J.Z. "was going to have some difficulty with circumstantial evidence."  As the trial court concluded, this was a gender-neutral reason for dismissing J.Z. and the evidence supported that determination.  (*See People v. Zambrano* (2007) 41 Cal.4th 1082, 1106-1107 [prosecutor's peremptory challenge of juror who might be reluctant to convict based on circumstantial evidence was not improper].)

[Petitioner] argues on appeal that because J.Z. later stated he would follow the law, his prior statements about circumstantial evidence are not relevant.  She also points to another male juror who was not dismissed, but who also questioned the concept of circumstantial evidence.  These arguments do not persuade us that the excusal of J.Z. was improper.  The fact that J.Z. later indicated willingness to follow the law did not negate the

18

comments that caused the prosecutor's concern. Additionally, the other juror who expressed confusion over the concept of circumstantial evidence and remained on the jury was also male. This fact runs contrary to [Petitioner's] argument that the prosecution systematically discriminated against male jurors.

In sum, we reject [Petitioner's] assertion that there was not sufficient evidence to support the trial court's finding that that the prosecution was not systematically discriminating against men. It is not our role to reassess the trial court's " ' "good faith by conducting [our] own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount ' "the variety of [subjective] factors and considerations," ' including "prospective jurors" body language or manner of answering questions," which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [Citations.]' [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92,136.) The trial court engaged in a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered by the prosecution and found the articulated gender-neutral reasons to be credible. Those " 'conclusions are entitled to deference on appeal.' " (*Ibid.*)

(ECF No. 1 at 23-33 (Internal footnotes omitted)).

## 2. Summary of Arguments

Petitioner contends that the appellate court's ruling unreasonably applies controlling case law to the *Batson* challenges. (ECF No. 2 at 17). Petitioner contends that the record fails to support the appellate court's reasons for upholding the challenge to all four jurors. (ECF No. 2 at 25-31). Furthermore, Petitioner contends that the circumstantial evidence for all four jurors proves that the strike was motivated in substantial part by discriminatory intent. (ECF No. 2 at 39).

Respondent argues Petitioner cannot show that the state court's decision was contrary to *Batson*, unreasonably applied *Batson*, or relied on unreasonable determinations of fact. (ECF No. 7-1 at 14). Respondent

argues the court properly found that the prosecutor articulated legitimate non-discriminatory explanations for excusing each challenged male prospective juror. (ECF No. 7-1 at 20). Further, Respondent argues there was more than enough evidence supporting the state court's denial of this claim. (ECF No. 7-1 at 31).

### 3. Legal Standard

The Equal Protection Clause forbids the prosecutor from dismissing potential jurors based solely on their gender. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 129 (1994) (extending *Batson* to challenges based on gender). *Batson* challenges are evaluated under a three-part test. *Johnson v. California*, 545 U.S. 162, 168 (2005). The test looks for: (1) the defendant to show an inference of discriminatory purpose; (2) the prosecutor to give neutral justifications; and (3) the trial court to decide if there was purposeful discrimination in dismissing jurors. *Id.* (internal citations and footnotes omitted).

To satisfy the first step, the defendant must show that the prosecution used its peremptory challenges to exclude members of a cognizable community group from the jury. *Batson,* 476 U.S. at 96. The trial court should consider all relevant circumstances to decide whether the defendant made the requisite showing. *Id.* at 96-97. Evidence of a numerical disparity is relevant to determining whether there was a discriminatory purpose. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). When the defendant establishes a prima facia case the burden of proof shifts to the plaintiff to give a gender-neutral explanation. *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

"At [the second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed [gender] neutral."

18cv01888-GPC-MDD

*Id.* at 768.  The explanation "need not rise to the level of justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97.  However, a prosecutor cannot rebut the defendant's prima facie case "by stating merely that he challenged jurors . . . on the assumption . . . that they would be partial to the defendant because of their [gender]." *Id.*  Nor can a prosecutor rebut the prima facie case by denying a discriminatory motive or affirming good faith. *Id.* at 98.  After the prosecution gives a gender-neutral explanation for the strike the trial court will determine whether the defendant established purposeful discrimination.  *See Johnson*, 545 U.S. at 168.

On the third step, the court considers several factors to determine if the prosecutor has offered a non-discriminatory, gender-neutral explanation for the challenge or if it was a pretext for purposeful discrimination.  *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003).  One factor is the percentage of challenges to jury members of a cognizable community group.  *United States v. Alvarez-Ulloa*, 784 F.3d 558, 565 (9th Cir. 2015).  Another factor is whether an unexcused juror and excused minority juror have the same qualities.  *Foster v. Chatman*, 136 S. Ct. 1737, 1754 (2016).  A third potential factor is whether the prosecutor (or the prosecutor's office) has a pattern of engaging in discriminatory practices in jury selection.  *Miller-El*, 545 U.S. at 263.

### 4. Analysis

The state courts reasonably applied each step of the *Batson* test.  The facts show that the Petitioner raised her first *Batson* motion after the prosecutor used his first four peremptory challenges against men.  (ECF No. 1 at 23).  Although the trial court determined the prima facia case was not met, the prosecutor chose to present his reasons for excluding the male jurors.  (ECF No. 1 at 24).  After the Petitioner's second *Batson* motion, the

trial court reasonably found there was a prima facia case of gender-based exclusion because the composition of the jury was four men and eight women. (ECF No. 1 at 24); *see*, *e.g.*, *Miller-El*, 545 U.S. at 241 (finding defendant established prima facia case of systematic exclusion where there was evidence of numerical disparity).

Likewise, step two of the *Batson* test was applied correctly. The state court properly noted that the prosecutor used six of his seven challenges on men and ordered the prosecutor to show cause. (ECF No. 2 at 15). The trial court found that the prosecutor gave a gender-neutral explanation and discriminatory intent was not inherent in the prosecutor's explanation. (ECF No. 8-7 at 66). The Petitioner specifically challenged the denial of the motion for four male jurors including J.Z., W.B., S.E., and M.S. (ECF No. 9 at 5).

The prosecutor's explanation that he dismissed J.Z. because he quarreled with the prosecutor on the concept of circumstantial evidence is facially valid and gender-neutral. (ECF No. 1 at 24). The prosecutor dismissed W.B. because he appeared to be a larger individual with signs of alcoholism or drug use, was disheveled in appearance and sweating profusely, had rotting teeth, and had worn the same pants for several days in a row. (ECF No. 1 at 24-25). These reasons are facially valid and gender-neutral. The prosecutor's explanation that he dismissed S.E. because he was a professor of psychology and might not accept the expert witness's testimony is facially valid and gender-neutral. (ECF No. 1 at 24). Finally, the prosecutor's explanation that he dismissed M.S. because M.S.'s "quarrel" with the defense raised concern about M.S. "being so technical" is facially valid and gender-neutral. (ECF No. 1 at 25-26). Therefore, the state court did not unreasonably apply case law by finding that each of the justifications for striking the four male jurors were gender-neutral and facially valid. (ECF

No. 1 at 33).

Finally, step three of the *Batson* test was applied correctly. The state court properly identified that the disparity between the male and female jurors was four men to eight women. (ECF No. 2 at 13-14). Moreover, the previous courts properly analyzed the similarities in the male jurors that were dismissed and female jurors that were not.

When the prosecutor explained that he dismissed W.B. because of his "sloppy" and "dirty" appearance, the trial court noted that it was "extremely hot" in the courtroom and other people were also sweating and wearing causal clothes. (ECF No. 7 at 24). The appellate court reasonably agreed with the trial court that the prosecutor's other reasons for dismissing W.B., namely his weight and former job as a postal worker, were gender-neutral and not pretextual. (ECF No. 1 at 29-30). More importantly, the state court diligently combed through the facts surrounding W.B.'s dismissal to determine that the reasons given were not pre-textual. *Batson*, 476 U.S. at 93 ("[A] court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"). Even though the trial judge did not agree with the prosecutor's contention that the juror's appearance was displeasing, the prosecutor's appearance-based explanation may be sincere and does not have to be rejected. *Thaler v. Haynes*, 559 U.S. 43, 48 (2010) (holding there is no bright lined rule against using an unfavored appearance as a reason for preemption where the prosecutor's disfavor of a juror's demeanor conflicted with the judge's opinion or recollection of the juror's demeanor). Therefore, the state court reasonably found that the prosecutor's appearance-based dismissal of W.B. was proper.

Likewise, the state court properly compared S.E., a male juror who was dismissed for his background in psychology, with a female juror who studied

psychology. (ECF No. 1 at 31). It was not unreasonable for the state courts to find that S.E.'s experience in psychology was unlike the female juror who was not dismissed. (ECF No. 1 at 31). S.E. was a professor of psychology and the female juror did not complete a degree in psychology or work in the field. (ECF No. 1 at 31). Courts have held that a juror may properly be dismissed because of his educational background and experience in psychology. *People v. Clark*, 52 Cal. 4th 856, 907 (2011); *People v. Gutierrez*, 28 Cal. 4th 1083, 1124-25 (2002); *People v. Landry*, 49 Cal. App. 4th 785, 790-91 (1996). Therefore, the state court properly found that the prosecutor's justifications were not pretextual. (ECF No. 1 at 31).

As for M.S. and J.Z, the state courts reasonably upheld their dismissal. Petitioner argues that the appellate court improperly allowed Respondent to add to its justifications for dismissing M.S. when it noted the Attorney General's expansion of his argument. (ECF No. 9 at 9). However, unlike *Miller-El* this was not a substitute argument. *Miller-El*, 545 U.S. at 252. Here, the appellate court did not act unreasonably because it relied on the prosecutor's argument at trial – and not the Attorney General's expansion – as the basis of the decision that the prosecutor's justifications for dismissing M.S. was not pretextual. (ECF No. 1 at 29). The appellate court did not "think up any rational basis" or "substitute a reason," it merely noted that there was an expansion of the argument. *Miller-El*, 545 U.S. 252.

The justifications for dismissing M.S. and J.Z. were similar. The prosecutor explained he dismissed M.S. for "quarreling" with the defense counsel on the rule of law. (ECF No. 1 at 26). The prosecutor similarly explained that he dismissed J.Z. because he "quarreled" with the prosecutor on the rule of law. (ECF No. 1 at 32). The trial courts first hand observations are of great importance in these situations. *Cook v. Lamarque*,

593 F.3d 810, 819 (9th Cir. 2010).  The trial court was able to observe the juror's demeanor, tone, and facial expression.  Under those observations, it is legitimate, not unreasonable, for the trial court to find that a prosecutor has a sincere concern with the juror's ability to follow the law.  *Cook*, 593 F.3d at 819-820.

The state court objectively and reasonably concluded that the trial court did not err in upholding the dismissal of the four male jurors after a *Batson* challenge based on gender discrimination.  This Court reaches the same conclusion and recommends finding the state court's determination is not unreasonable or contrary to federal law.  Accordingly, this Court **RECOMMENDS** Claim One be **DENIED**.

## B.    Claim Two: Error in Jury Instruction on Involuntary Manslaughter

Petitioner contends the trial court unreasonably instructed the jury that they could not convict Petitioner of involuntary manslaughter unless they first found her not guilty of voluntary manslaughter.  (ECF No. 2 at 39). Petitioner argues the trial court's instruction infringed on her right to a meaningful opportunity to present a complete defense, and reduced the prosecutor's burden of proving malice.  (ECF No. 2 at 39).

### 1. State Court Opinion

Petitioner presented this claim to the state appellate and supreme courts on direct review.  (ECF No. 1 at 2).  The appellate court rejected Petitioner's contention that the trial court's jury instruction on involuntary manslaughter was harmful and denied the claim on its merits.  (ECF No. 1 at 40-41).  This Court again "looks through" to the state appellate court's opinion denying the claim.  *Ylst.* 501 U.S. at 805-06.  That court wrote:

///

## II
### Involuntary Manslaughter Jury Instruction

[Petitioner] next asserts the court erred when it instructed the jury: "If all of you agree that the defendant is not guilty of second degree murder and not guilty of voluntary manslaughter, but all of you agree that the defendant is guilty of involuntary manslaughter, complete and sign the [verdict] forms for not guilty of second degree murder, not guilty of voluntary manslaughter, and complete and sign the form for guilty of involuntary manslaughter."

She argues this instruction constituted reversible error because it suggested that [Petitioner] could only be found guilty of involuntary manslaughter if the jury first concluded she was not guilty of voluntary manslaughter.   She also asserts this error violated her due process rights under the United States Constitution and, thus, requires reversal unless the People prove beyond a reasonable doubt that the error was harmless.   The Attorney General concedes that "the court did instruct the jurors in a manner that could have led them to believe that involuntary manslaughter was a lessor [sic] included offense of voluntary manslaughter," but contends the error is harmless.   The Attorney General argues that because the jury convicted [Petitioner] of second degree murder and found true the allegation that she intended to discharge the firearm, the jury expressly found that [Petitioner] acted with malice.   We agree.

### A. Relevant Background

The standard version of the instruction at issue, CALCRIM No. 642, states that when, as here, the defendant is charged with second degree murder, and both voluntary and involuntary manslaughter are possible lessor [sic] included offenses, the court should instruct the jury that "3. If all of you agree that the defendant is not guilty of second degree murder complete and sign the form for not guilty of second degree murder.  [¶] 4. If all of you agree on a verdict of guilty or not guilty of voluntary manslaughter or involuntary manslaughter, complete and sign the appropriate verdict form for each charge on which you agree.   Do not complete or sign any other verdict forms [for that count].  You may not find the defendant guilty of both voluntary and involuntary manslaughter [as to any count].  [¶]  5. If you cannot reach

26

agreement as to voluntary manslaughter or involuntary manslaughter inform me of your disagreement. Do not complete or sign any verdict form for any charge on which you cannot reach agreement."

At the instruction conference, the trial court pointed out the deficiency in the instruction patterned after CALCRIM No. 642. The court noted that the instruction needed to be modified to cover "every possible outcome." At a subsequent conference, the court indicated its approval of all of the proposed jury instructions, except No. 642, which it stated was deficient because it "lump[ed] both involuntary manslaughter . . . and voluntary manslaughter into the same paragraph." The court subsequently indicated it had rewritten the instruction and would distribute it to counsel for their review. Despite these comments, however, the trial court gave the instruction without making the modifications it had noted were necessary. After properly instructing the jury on second degree murder, voluntary manslaughter (including heat of passion and imperfect self- defense) and involuntary manslaughter, the court told the jury it could not "accept a guilty verdict of involuntary manslaughter unless you find her not guilty of second-degree murder and voluntary manslaughter."

The court then told the jurors to write down "642" and that they should look carefully at the instruction while completing the verdict forms. The court read the instruction, which included the deviation from the pattern instruction, stating "If all of you agree that the defendant is not guilty of second-degree murder and not guilty of voluntary manslaughter, but all of you agree that the defendant is guilty of involuntary manslaughter, complete and sign the forms for not guilty of second-degree murder, not guilty of voluntary manslaughter, and complete and sign the form for guilty of involuntary manslaughter." The instruction did not include the circumstance of the jury finding [Petitioner] not guilty of second degree murder and not guilty of involuntary manslaughter, but guilty of voluntary manslaughter.

B. *Homicide Principals*

First degree murder is an unlawful killing with malice aforethought, premeditation and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Second degree murder is an unlawful killing with malice, but without the elements of

premeditation and deliberation. (*Ibid.*) Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life). (*Ibid.*) Even when a defendant has the intent to kill or conscious disregard for life, a homicide may be further reduced to voluntary manslaughter in limited, explicitly defined circumstances that are viewed as negating malice. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*); *People v. Lasko* (2000) 23 Cal.4th 101, 107-109.)

For voluntary manslaughter, malice is deemed to be negated by only either the defendant's (1) heat of passion arising from provocation that would cause a reasonable person to react with deadly passion, or (2) unreasonable but good faith belief in the need to act in self-defense (imperfect self-defense). (*Moye, supra*, 47 Cal.4th at p. 549) Under these two limited circumstances, malice is negated even though the lethal act was committed with the intent to kill or conscious disregard for life that otherwise establishes malice. (See *People v. Bryant* (2013) 56 Cal.4th 959, 968 (*Bryant*); *People v. Rios* (2000) 23 Cal.4th 450, 460-461, 467.)

Heat of passion for voluntary manslaughter has both a subjective and objective component: (1) The defendant must have killed while actually in the heat of passion induced by the provocation, and (2) the provocative conduct must be such that a reasonable person would have reacted in the heat of passion. (*Moye, supra*, 47 Cal.4th at pp. 549-550.) If the provocation would not cause an average person to react in the heat of passion, but it precluded the defendant from subjectively deliberating and premeditating, the crime is second degree murder. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296; *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Finally, an unlawful homicide without intent to kill and without conscious disregard for life is involuntary manslaughter. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006 (*Butler*).) Involuntary manslaughter can arise from a lawful act, a misdemeanor, or a non inherently dangerous felony committed with criminal negligence; i.e., aggravated, reckless conduct that creates a foreseeable high risk of death. (*Id*. at pp. 1006, 1008; see *Bryant, supra*, 56 Cal.4th at p. 974 (conc. opn. of Kennard, J.).) "[I]n order to convict a person of voluntary manslaughter, the jury must find that the killing was intended and was *unlawful* in that it was *neither justifiable*, that is, did not constitute lawful defense

28

of self, others, or property, prevention of a felony, or preservation of the peace (§ 197 . . . ); *nor excusable*, that is, the killing did not result from a lawful act done by lawful means with ordinary caution and a lawful intent, and did not result from accident and misfortune under very specific circumstances, including that no dangerous weapon was used (§ 195 . . . ).”  (*People v. Orr* (1994) 22 Cal.App.4th 780, 784 (*Orr*).)

In order to convict a person of involuntary manslaughter, the jury must find that the killing was *unlawful* in that it occurred in the commission of an ordinarily lawful act which inherently involved a high degree of risk of death or great bodily harm and was accomplished in a criminally negligent manner.  “The definition of *unlawful* as an element of involuntary manslaughter differs significantly from that of voluntary manslaughter and requires the trier of fact to make substantially different findings.” (*Orr, supra*, 22 Cal.App.4th at p. 784.)  Therefore, “[v]oluntary manslaughter can be committed without committing involuntary manslaughter, and thus the latter is not a lesser included offense of voluntary manslaughter.”  (*Ibid.*)  “While both voluntary and involuntary manslaughter are lesser included offenses of murder, it does not follow that involuntary manslaughter is a lesser included offense of voluntary manslaughter.  They are merely siblings who have a common parent.”  (*Id.* at pp. 784-785.)

C. *Analysis*

As stated, the Attorney General concedes there was instructional error.   The instruction, and the trial court’s comments before giving that instruction, incorrectly suggested to the jury that it was required to determine whether [Petitioner] was guilty of voluntary manslaughter before considering whether she was guilty of involuntary manslaughter.   [Petitioner] asserts the error lightened the prosecutor’s burden of proof by allowing the jury to reach the issue of criminal negligence only if it first rejected a finding of malice based on the existence of heat of passion or imperfect self-defense.   She further contends this error violated her constitutional due process rights, requiring us to review the error under the rigorous standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).   Under *Chapman*, the verdict must be reversed unless the beneficiary of the error proves

"beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24.)

The Attorney General responds that the error did not lessen its burden of proof (and, therefore, was not of constitutional dimension) because the jury was properly instructed on the element of malice, which was required to find [Petitioner] guilty of second degree murder. According to the Attorney General, whether the jury concluded [Petitioner] "acted with express or implied malice, either finding ruled out the possibility of" manslaughter. Put another way, the jury explicitly rejected a finding of the reduced level of culpability needed for either voluntary or involuntary manslaughter by concluding [Petitioner] possessed the malice required for second degree murder.

The Attorney General argues further that the jury also rejected a theory of implied malice and concluded [Petitioner] acted with express malice by finding true the firearm enhancement allegation that [Petitioner] "intended to discharge the firearm" when she shot Jason. The Attorney General asserts "the jury was given the option of finding that appellant acted with express malice when she shot and killed Jason, or that she had acted with implied malice by merely pointing the gun at Jason." It chose the former, rejecting [Petitioner's] defense that the gun accidentally discharged.

We agree with the Attorney General that the jury's decision to convict [Petitioner] of second degree murder by finding she acted with either express or implied intent foreclosed the possibility that [Petitioner] might have been found guilty of involuntary manslaughter, even if the erroneous jury instruction had not been given. "Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. [Citations.] Implied malice murder requires a defendant's conscious disregard for life, meaning that the *defendant subjectively appreciated the risk involved*." (*Butler, supra*, 187 Cal.App.4th at pp. 1008-1009, italics added.) Involuntary manslaughter, in contrast, requires a showing that "the defendant had a subjective, good[-]faith belief that his or her actions posed no risk," but a "reasonable person would have been aware of the risk." (*Ibid*.) Said another way, "involuntary

manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable." (*Id*. at p. 1009.)

The jury concluded that [Petitioner] either expressly intended to kill Jason when she fired the gun, or she impliedly intended to kill because she committed an act, the natural and probable consequences of which were dangerous to human life, and that *she knew her act was dangerous to human life* and acted deliberately.   Either of these findings precluded the jury from also concluding that [Petitioner] had a subjective, good-faith belief that her actions posed no risk to Jason's life.

Contrary to [Petitioner's] assertion, the jury's rejection of her voluntary manslaughter defense (that she acted in imperfect self-defense or in the heat of passion) does not show that the jury failed to consider that [Petitioner] was criminally negligent.   Rather, the jury's conclusion that she acted with express or implied intent necessarily meant that the jury also concluded she subjectively did not lack intent—the state of mind required to find she was guilty only of involuntary manslaughter.   For this reason, the court's erroneous instruction was harmless under any possible standard of review.   There is no reasonable likelihood that the jury would have reached a different verdict, finding [Petitioner] not guilty of second degree murder and instead guilty of involuntary manslaughter, absent the error.

(ECF No. 1 at 33-41).

## 2. Summary of Arguments

Petitioner argues that the appellate court misapplied the harmless error analysis when it held that the jury would have found Petitioner guilty of second degree murder even if the erroneous jury instruction had not been given.  (ECF No. 2 at 41).  Petitioner asserts that the correct analysis should consider the extent to which the jury instruction prevented the jury from deliberating whether the crime was involuntary manslaughter rather than second degree murder.  (ECF No. 2 at 41).

Respondent concedes that the jury was not properly instructed on involuntary manslaughter but argues that the error was harmless. (ECF No. 7-1 at 35). Respondent argues that after the jury expressly found the Petitioner acted with malice it was not possible to find the Petitioner committed an involuntary manslaughter which requires the jury to find the Petitioner acted with a subjective good-faith belief that her actions posed no risk to human life. (ECF No. 1 at 40). Respondent further argues that the evidence showing the Petitioner acted with malice was so strong that the jury would not have reached a different conclusion even if the instruction on involuntary manslaughter was more clear. (ECF No. 7-1 at 36-37).

### 3. Legal Standard

"Normally jury instructions in State trials are matters of State law." *Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). Habeas relief is available only when a petitioner demonstrates that "[an] ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). A challenged instruction must be evaluated in the context of other instructions and the trial record, not in artificial isolation. *Estelle*, 502 U.S. at 72.

Errors in jury instructions involving "omissions or incorrect descriptions of elements are considered trial errors" and are subject to a harmless error analysis. *Lara v. Ryan*, 455 F.3d 1080, 1086 (9th Cir. 2006). In habeas cases involving instructional error, a habeas petitioner is generally not entitled to habeas relief unless such error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson* ("*Brecht*"), 507 U.S. 619, 637-38 (1993).

///

///

### 4. Analysis

Here, Petitioner fails to meet her heavy burden to show that the erroneous instructions violated her right to due process. First, to the extent Petitioner's claim is predicated upon the trial court's failure to give a lesser included offense instruction, such a claim is not cognizable on federal habeas review and should be denied on that basis. *Arana v. Davis*, No. 16-cv-05655-WHO (PR), 2018 U.S. Dist. LEXIS 26024, at 10 (N.D. Cal. Feb. 16, 2018).

Second, even if Petitioner's claim is reviewable based upon a potential denial of due process, it lacks merit. In California, involuntary manslaughter — a lesser included offense of murder — is an unlawful killing without malice in the commission of either: (1) an unlawful act, not amounting to felony; or (2) a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. Penal Code § 192(b). By contrast, "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements — i.e., willfulness, premeditation, and deliberation — that would support a conviction of first degree murder." *People v. Nieto Benitez*, 4 Cal. 4th 91, 102 (1992) (citations omitted); Penal Code §§ 187(a), 189. As the appellate court noted, "the jury's decision to convict [Petitioner] of second degree murder by finding she acted with either express or implied intent foreclosed the possibility that [Petitioner] might have been found guilty of involuntary manslaughter." (ECF No. 1 at 39-40). The jury had the opportunity to decide that Petitioner acted without malice, but declined to do so.

Therefore, this Court agrees with the appellate court's conclusion that there is no reasonable likelihood that the jury would have reached a different verdict absent the error. Accordingly, this Court **RECOMMENDS** Claim Two be **DENIED**.

**C.    Claim Three: Ineffective Assistance of Counsel**

Petitioner argues that defense counsel provided ineffective assistance of counsel when he failed to object to the prosecutor's argument that accidental discharge of a firearm amounted to implied malice.  (ECF No. 2 at 51).  Petitioner further argues that there was no tactical reason for the defense counsel's repeated failures to object.  (ECF No. 9-1 at 25-26).

**1. State Court Opinion**

Petitioner presented this claim to the state appellate and supreme courts on direct review.  (ECF No. 1 at 2).  The appellate court rejected Petitioner's contention that the defense counsel provided ineffective assistance of counsel.  (ECF No. 1 at 45). This Court again "looks through" to the appellate court's opinion denying the claim.  *Ylst.* 501 U.S. at 805-06. That court wrote:

III

*Ineffective Assistance of Counsel for Failure to Object to Closing Statement*

[Petitioner] next contends that her trial counsel provided ineffective assistance by failing to object to the prosecutor's improper suggestion in his closing argument that the accidental discharge of a gun is sufficient to demonstrate implied malice. The Attorney General responds that the prosecutor's argument was not improper because he correctly asserted that pointing a loaded weapon at another person, which then accidently discharges, may support a finding of implied malice.  The Attorney General also argues that even if the prosecutor's statements were improper, [Petitioner's] defense counsel's tactical decision not to object to the closing statement did not constitute ineffective assistance of counsel.  We agree.

A. *Relevant Background*

The thrust of the prosecutor's closing argument was that [Petitioner] intentionally shot her husband and was guilty of second degree murder on a theory of express malice.  The

34

prosecutor also argued that, even if the jury did not conclude that [Petitioner] intentionally fired the gun at Jason, she was still guilty of second degree murder under a theory of implied malice if she pointed the loaded gun at Jason and then unintentionally or accidentally fired the gun.  The prosecutor explained to the jury that it could find [Petitioner] acted with implied malice in this circumstance if it believed she "intentionally committed an act, the natural and probable consequences of which are dangerous to human life."

The prosecutor asserted that either [Petitioner] intentionally killed Jason "by pulling the trigger of the gun or she accidentally killed while point[ing] a loaded handgun at another human being." The prosecutor contrasted this explanation of implied malice with an example of the state of mind required for involuntary manslaughter.  The prosecutor explained that if [Petitioner] were simply "brandishing" the gun, "defined as simply showing or displaying a gun in a rude or angry manner . . . and if someone were to accidently be killed in that circumstance, it would be an involuntary manslaughter."  [Petitioner's] defense attorney did not object to any of these explanations.

B. *Legal Standards*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).)  That right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*Ibid.*)  A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *Ledesma*, at pp. 216, 218.)  Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland*, at p. 698.)

In addition, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record

on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see also *People v. Anderson* (2001) 25 Cal.4th 543, 569 ["When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation."].) "'[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 675.)

C. *Analysis*

[Petitioner] has not shown that her defense attorney's failure to object constituted ineffective assistance of counsel. First, as stated, the decision as to whether to object to statements in closing arguments is a highly tactical one. [Petitioner's] attorney may have determined that arguing the issue, as he did, would be more effective than objecting. Second, and more importantly, the prosecutor's description of malice was not improper. Malice, as set forth above, may be express or implied. (§ 188.) As the prosecution explained during his closing argument, and as the jury was instructed, "malice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life." (*People v. Thomas* (2012) 53 Cal.4th 771, 814 (*Thomas.*) "An unintentional shooting resulting from the brandishing of a weapon can be murder if the jury concludes that the act was dangerous to human life and the defendant acted in conscious disregard of life. (*People v. Benitez* (1992) 4 Cal.4th 91, 108-109; see also *In re Russell H.* (1987) 196 Cal.App.3d 916, 920-921 [substantial evidence supported juvenile court's finding of second degree implied malice murder where the minor pointed a loaded gun at the victim and threatened to shoot him, and the gun went off when a third party attempted to take it away].)" (*Thomas,* at pp. 814-815.)

[Petitioner] relies on a list of cases to argue that a homicide cannot amount to second degree murder if it "results from the accidental or negligent discharge of a firearm." None of these

cases, however, contain such a holding, and none involve a murder conviction that was reversed because the defendant's act of brandishing a weapon was found insufficient to show implied malice. (See *People v. Clark* (1982) 130 Cal.App.3d 371, 375 [defendant convicted of involuntary manslaughter after shooting the victim during an argument; whether the defendant's actions could show implied malice not at issue]; *People v. Carmen* (1951) 36 Cal.2d 768, 772 [Supreme Court reversed conviction for first degree murder where court failed to instruct on involuntary manslaughter; the court noted that there was a "contention that the evidence was insufficient to support the conviction of first degree murder" but that it was "clearly ample."]; *People v. Southack* (1952) 39 Cal.2d 578, 584 [accidental discharge of weapon supported the defendant's conviction for voluntary manslaughter; no discussion of implied malice or whether defendant's conduct could support a higher level of culpability]; *People v. Velez* (1983) 144 Cal.App.3d 558, 562 [accidental discharge of weapon resulted in conviction for involuntary manslaughter; no discussion of implied malice or whether defendant's actions could support higher level of culpability]; *People v. Ramirez* (1979) 91 Cal.App.3d 132, 135 [same]; *People v. Walls* (1966) 239 Cal.App.2d 543, 544 [same]; *People v. Freudenberg* (1953) 121 Cal.App.2d 564, 571, 574 [same.])

The evidence before the jury showed [Petitioner] had owned a gun since she was a college student. In addition to the gun she used to shoot Jason, she also owned two other guns. [Petitioner] also testified she kept the guns hidden away from her children. [Petitioner] removed the gun from her safe because she feared Jason, and she pointed the gun at Jason because she wanted to stop him from assaulting her. This evidence showed [Petitioner] understood the risks associated with firearms and disregarded those risks when she pointed the loaded gun at Jason. Simply put, even if the discharge of the weapon was not purposeful, [Petitioner's] actions before the weapon was fired were dangerous to human life and showed a conscious disregard of that life. (*Thomas, supra*, 53 Cal.4th at pp. 814-815.) The prosecutor's explanation of this standard was accurate and the failure of [Petitioner's] defense counsel to object did not constitute ineffective assistance of counsel.

(ECF No. 1 at 41-45).

### 2. Summary of Arguments

Petitioner contends that during closing arguments the prosecutor repeatedly argued second degree murder with implied malice can be based on accidentally discharging a firearm. (ECF No. 2 at 47). Petitioner contends that the prosecutor's argument was improper, and the defense counsel acted improperly when he repeatedly failed to object. (ECF No. 2 at 47-48). Petitioner further argues that there are several cases supporting her assertion that implied malice may be found when there is a conscious disregard for life and that accidental discharge of a firearm does not require a conscious disregard for life. (ECF No. 2 at 48). Finally, Petitioner argues that the defense counsel's failure to object was unreasonable and stifled the heart of her defense by prejudicing the jury. (ECF No. 9-1 at 25-28).

Respondent maintains that the prosecutor's main argument was that the Petitioner's act was intentional. (ECF No. 7-1 at 37). However, Respondent argues that even if the jury found that the Petitioner accidently pulled the trigger, it is not unreasonable to say that the Petitioner could still be guilty of second degree murder because she brandished a firearm with a conscious disregard for human life. (ECF No. 7-1 at 39-40). Furthermore, Respondent argues that the defense counsel's lack of objection was reasonable because the record indicates the choice was tactical. (ECF No. 7-1 at 38-39). The defense counsel addressed the prosecutor's examples for involuntary manslaughter in his closing statement. (ECF 8-27 at 122-23). Moreover, Respondent contends that the failure to object was not prejudicial because the jury was thoroughly instructed on the applicable law separate from the prosecutor's arguments. (ECF No. 7-1 at 41). Finally, the court

instructed the jury that nothing the attorneys said during summation was evidence, and could not be used as a basis for their verdict.  (ECF No. 8-2 at 155).

### 3. Legal Standard

The Sixth Amendment provides that the defendant has a right to counsel.  *Strickland v. Washington* (*Strickland*), 466 U.S. 668, 685 (1984).  The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland*.  *See Williams v. Taylor*, 529 U.S. 362, 391 (2000).

The defendant's claim of ineffective assistance of counsel due to a failure to object has two prongs.  *Strickland*, 466 U.S. at 687.  The defendant must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense.  *Id.*  The first prong requires the defendant to show "that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."  *Id.*  The test is whether the attorney performed as a reasonable attorney pursuant to prevailing professional norms.  *Id.* at 688.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Moreover, the counsel's actions must be evaluated from the counsel's perspective at the time, not in hindsight.  *Id.*  There is a strong presumption that the counsel rendered adequate assistance.  *Id.* at 690.

The second prong requires the defendant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  The counsel's error must be prejudicial to the defense for the court to find that there was ineffective assistance.  *Id.* at 692.  Ultimately, the defendant must show that there is a

18cv01888-GPC-MDD

reasonable probability that absent counsel's errors the outcome would have been different. *Id.* at 694.

Ineffective assistance of counsel is a mixed question of law and fact. *Id.* at 698. "The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial." *Id.* at 697. No special standards apply for ineffectiveness claims made in habeas proceedings. *Id.* at 698.

### 4. Analysis

Here, we agree with the state court that Petitioner does not meet the first prong. (ECF No. 7-1 at 38-39). It is common for lawyers to refrain from objecting during closing arguments. *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993). "[A]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the "wide range" of permissible professional legal conduct." *Id.* at 1281; *Roybal v. Davis*, 148 F. Supp. 3d 958, 1095 (S.D. Cal. 2015) (finding egregious misstatement may lie where the prosecutor uses biblical law to support his case instead of the laws of the state). In the present case, the record shows that the prosecutor informed the jury of the prevalent law on second degree murder and involuntary manslaughter. (ECF No. 8-27 at 62-70). Furthermore, the prosecutor primarily argued that the Petitioner had the intent to kill under an express malice theory. (ECF No. 8-27 at 65-67). Although the prosecutor gave examples of when accidental shootings may constitute implied malice, it was reasonable for the defense counsel to withhold an objection because the prosecutor properly explained malice. *See* Penal Code § 188; *People v. Thomas*, 53 Cal. 4th 771, 814 (2012). Thus, it is reasonable by professional standards for the defense counsel to withhold an

objection during closing arguments when the prosecutor correctly stated the law.

The second component of *Strickland* is also not met because Petitioner does not affirmatively prove prejudice. Petitioner argues that the jury rejected the theory of involuntary manslaughter after hearing the prosecutor's improper explanation of involuntary manslaughter. (ECF No. 9-1 at 28). However, as explained before, the record shows that the prosecutor's main argument was that the jury should find the Petitioner acted with express malice. (ECF No. 8-27 at 65-67). Then the prosecutor briefly discussed how an accidental shooting may still constitute second degree murder if there is a conscious disregard for human life when a killing occurs. (ECF No. 8-27 at 67-70). This is a correct explanation of the law and the Petitioner does not show that an objection to those comments would have changed the case. *See People v. Patterson*, 49 Cal. 3d 615, 626 (1989). Furthermore, there is no reasonable likelihood that the proceeding would have come out differently because the evidence shows that the Petitioner acted with a conscious disregard for a human life when she pointed a loaded gun at her husband. (ECF No. 1 at 45).

Accordingly, the two *Strickland* prongs are not met because the defense counsel acted reasonably in light of prevailing professional norms and Petitioner failed to show prejudice. The state court's adjudication did not result in a decision contrary to federal law and did not unreasonably apply federal law. *See* 28 U.S.C § 2254(d); *Early*, 537 U.S. at 8. Accordingly, the Court **RECOMMENDS** Claim Three be **DENIED**.

## IV. CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this

18cv01888-GPC-MDD

Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **May 3, 2019**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 13, 2019**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   April 19, 2019

Hon. Mitchell D. Dembin
United States Magistrate Judge

18cv01888-GPC-MDD