1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JULIE HARPER,

                     Petitioner,

v.

MOLLY HILL, et al.,

                     Respondent.

Case No.:  3:18-cv-01888-GPC-MDD

**1) ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND**

**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR A CERTIFICATE OF APPEALABILITY**

Petitioner Julie Harper ("Petitioner"), a state prisoner represented by her attorney, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), challenging her conviction in San Diego Superior Court Consolidated Case No. SCN 308840.  ECF No. 1, at 1.  Under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the U.S. District Court for the Southern District of California, Magistrate Judge Mitchell D. Dembin submitted a Report and Recommendation ("R&R") recommending that the Court

(1) approve and adopt the R&R, and (2) deny the Petition.  ECF No. 11. The Court has read and considered the Petition and Supporting Memorandum of Points and Authorities (ECF Nos. 1, 2), the Answer (ECF No. 7), Petitioner's Traverse (ECF No. 9), the R&R (ECF No. 11), Petitioner's Objections to the R&R (ECF No. 14), the lodgments and other documents filed in this case, and the legal arguments presented by both parties.

For the reasons below, the Court ADOPTS the Magistrate Judge's Report and Recommendation, OVERRULES Petitioner's Objections to the R&R, DENIES the Petition, and GRANTS a certificate of appealability with respect to the first ground of the Petition only.

# I. BACKGROUND

**A. Factual Background**

The Court gives deference to state court findings of fact and presumes them to be correct.  Petitioner is able to rebut this presumption, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  When analyzing a habeas petition, federal courts review the last reasoned decision afforded by the state courts.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991).

Petitioner was charged with murder in the second degree of Jason Harper, her husband, pursuant to Cal. Penal Code § 187(a).  ECF No. 8-1 at 16–18.[1]  It was further alleged that Petitioner personally and intentionally discharged a firearm within the meaning of Cal. Penal Code §§ 12022.53(d) and 12022.5(a).  *Id.*  The state appellate court recounted the relevant facts of Petitioner's trial court proceedings as follows:

*The Prosecution's Case*

On the morning of Tuesday, August 7, 2012, Jason and [Petitioner] argued in the master bedroom of their Carlsbad home. . . . The couple's relationship had deteriorated significantly in the years leading up to that day and had become exceptionally tense in the days immediately preceding. The argument that morning ended with [Petitioner] shooting and killing Jason with a gun she had hidden under her pillow. After the gun went off sometime before

---

[1] Page numbers for documents filed on the docket for this Petition refer to those imprinted by the court's electronic case filing system.

9:00 a.m., the Harpers' older two children went upstairs to see what had happened. [Petitioner] opened the bedroom door slightly and told her nine-year-old son that Jason had fallen off a chair. [Petitioner] did not let the children into the room, instead telling them to go back downstairs.

. . .

[Petitioner] then told the children to get ready and took them to a nearby coffee shop they frequented. . . . Around 1:00 p.m., [Petitioner] arrived at [her sister] Killpack's house in University City with the three children. [Petitioner] left] by herself, telling Killpatrick she needed to run an errand.

Around 3:00 p.m., [Petitioner] arrived at her father's real estate office near downtown San Diego. [Petitioner] told her father, John Cihak, that Jason was dead and that she had killed Jason in self-defense.

. . .

Around 11:00 p.m., [Petitioner's trial attorney] Pfingst called the Carlsbad Police Department and asked them to check on the welfare of Jason at the Harpers' home. Officers searched the house and discovered Jason's body in the master bedroom. The medical examiner determined Jason was killed by a single gunshot that entered the back-left side of his torso and went through his heart.

. . .

The following afternoon, the police . . . arrested [Petitioner]. [Petitioner] had no injuries on her body at the time she was taken into custody.

The prosecution put on several relatives and friends of the Harpers who testified that they never saw any sign of physical abuse or unexplained injuries on [Petitioner's] body, and that [Petitioner] never reported any abuse or acted afraid of Jason. The Harpers' two older children both testified that they had never seen Jason hit [Petitioner], but that they had seen [Petitioner] strike Jason. The children did testify that their parents argued and that during arguments Jason used explicit language. Killpack testified that the month before Jason's death, [Petitioner] told her that Jason was physically abusing her, specifically that Jason had grabbed and twisted [Petitioner's] wrists and that it was extremely painful because of [Petitioner's] arthritic condition. [Petitioner] never told Killpack that she had been raped and Killpack never saw any physical injury on [Petitioner]. Cihak testified that at one point [Petitioner] told him she needed protection from Jason and that things were bad between them, but that [Petitioner] did not explain in any further detail.

*The Defense Case*

[Petitioner] took the stand in her own defense. She portrayed Jason as an abusive and controlling husband. She told the jury that his abusive behavior had begun in 2009. She stated that at that time, Jason would yell and scream at her in front of their children, criticize her weight and call her derogatory, explicit names. She also testified that she was suffering from severe pain from multiple, diagnosed inflammatory conditions related to rheumatoid arthritis, and that Jason was unsympathetic to her physical limitations. She alleged that over the years, Jason, a high school math teacher, had taken thousands of dollars from the couples' joint banking accounts and transferred it to accounts in his name only without her consent.

[Petitioner] told the jury that Jason raped her for the first time in January 2010 after Jason became upset about [Petitioner] spending money on the children and on her medical care. [Petitioner] testified that from that incident to Jason's death, he raped her approximately 30 times. [Petitioner] stated she kept a day planner in which she made notations of when she and Jason had sex and testified that some of the entries for sex were actually a code to herself to document rape. [Petitioner] also testified that she sent some of the planner entries to her former fiancé during this time frame.

. . .

[Petitioner] testified that on the evening before Jason's death, after the couple had put the kids to bed, they argued about their marriage and finances. [Petitioner] stated that she was awoken the next morning by Jason throwing things on top of her and screaming about finding his computer, which [Petitioner] had moved. According to Petitioner], Jason then angrily left the house and returned shortly after. When he returned, [Petitioner] admitted she had hidden Jason's computer under the bed and then told Jason she had filed for divorce. [Petitioner] testified that Jason became "livid" and started shaking her and ripping off her clothes. [Petitioner] said she believed Jason was going to rape her and grabbed her gun from under her pillow and pointed it at him. [Petitioner] testified Jason then yelled "I'm going to kill you, you fucking bitch" and came after her. [Petitioner] told the jury the gun went off accidently and she ran into the bathroom to hide.

[Petitioner] saw that Jason was on the ground, and eventually went to check on him. She realized he was dead and covered him with a blanket. When the older children knocked on the bedroom door, she told them Jason had fallen off a chair. [Petitioner's] testimony of the rest of the day corroborated the testimony of the prosecution witnesses. . . .

4

[Petitioner's] defense team also presented the testimony of two experts, a forensic criminologist who testified about accidental discharge of firearms in stressful situations and a psychologist specializing in intimate partner abuse. The psychologist, Dr. Mindy Mechanic, testified about the difficulty women who are being abused by their husbands face in leaving the relationship. Dr. Mechanic also testified about the stigma attached to telling other people about abuse that is occurring in a romantic relationship. Dr. Mechanic opined that [Petitioner] was abused by Jason, and that her behavior was consistent with that shown in research concerning victims of domestic violence.

### The Prosecution's Rebuttal

The prosecution offered the testimony of Dr. Daniel Martell, a forensic psychologist, to rebut Dr. Mechanic's testimony. Dr. Martell testified he had received training on domestic violence and had worked on over 1,000 cases that involved domestic violence in some respect. After the Court qualified Dr. Martell as an expert on domestic abuse over the defense's objection, he gave his opinion that [Petitioner's] documentation of her behavior in her journal, which reflected a desire for more intimacy and sex with Jason, was the opposite of the behavior he expected for someone who is being violently raped. He also noted that after [Petitioner] alleged the abuse began, she did things to antagonize Jason, a behavior contrary to that expected from a domestic violence victim who would want to avoid further abuse.

ECF No. 8-38 ("Ct. App. Op."), at 3–10.

**A. Procedural Background**

Petitioner's first trial had resulted in the jury finding her not guilty of first-degree murder and deadlocked on the lesser included offenses of second-degree murder and manslaughter. *Id.* at 2. On October 8, 2015, following her second trial, the jury found Petitioner guilty of second-degree murder as defined by Cal. Penal Code § 187(a). ECF No. 8-2 at 197. Further, the jury found that Petitioner had personally and intentionally used and discharged a firearm within the meaning of Penal Code §§ 12022.53(d) and 12022.5(a). *Id.* On January 15, 2016, Petitioner was sentenced to state prison for forty years to life, the sum of fifteen years to life for second degree murder and twenty-five years to life for personally and intentionally discharging a firearm causing a death. ECF No. 8-3 at 31–32.

On January 15, 2016, Petitioner filed an appeal in the Fourth District of the California Court of Appeal ("Court of Appeal") where she raised five claims, including the three raised in this Petition: A Fourteenth Amendment equal protection claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), concerning the dismissal of four male jurors at the trial court proceeding; a claim for violation of the constitutional right to a meaningful opportunity to present a complete defense, arising from an erroneous jury instruction on involuntary manslaughter; and a claim for ineffective assistance of counsel under the Sixth Amendment arising from trial counsel's failure to object to the prosecutor's statements during closing arguments.  Ct. App. Op. at 2.  On January 5, 2018, the appellate court rejected all of Petitioner's claims and affirmed the trial court's judgement but remanded the matter for a new sentencing hearing.  *Id.* at 3.

Petitioner then filed a petition in the California Supreme Court, raising the same three claims raised here.  ECF No. 8-39.  On April 18, 2018, the California Supreme Court denied the petition without providing any reasoning or citation to authority. ECF No. 8-40.

On August 13, 2018, Petitioner filed this Petition in the U.S. District Court for the Southern District of California under 28 U.S.C. § 2254, raising her *Batson*, erroneous jury instruction, and ineffective assistance of counsel claims.  ECF No. 1.  Following briefing, the Magistrate Judge issued an R&R recommending that the Court deny the Petition.  ECF No. 11.  Petitioner filed an objection, ECF No. 14, and this Court's review follows.

## II. LEGAL STANDARD

### A. Magistrate Judge's Report and Recommendation

Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1) outline the procedures that apply to the district court's treatment of a magistrate judge's report and recommendation.  The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C); *see also United States v. Raddatz*, 447 U.S. 667, 675 (1980).  Because

objections were made, the Court reviews de novo the parts of the magistrate judge's findings and recommendations to which specific objections have been made.  Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

### B. The Antiterrorism and Effective Death Penalty Act of 1996

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a court will not grant a habeas petition with respect to any claim adjudicated on the merits by the state court unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Early v. Packer*, 537 U.S. 3, 7–8, (2002) (quoting 28 U.S.C. § 2254(d)).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential standard of review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal court may grant habeas relief under the "contrary to" clause of Section 2254(d) if the state court applied a different rule than the governing law established by the Supreme Court, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state court need not cite Supreme Court precedent when resolving a habeas corpus claim "so long as neither the reasoning nor the result of the state-court action contradicts [Supreme Court precedent]." *Early*, 537 U.S. at 8.  The court may grant relief under the "unreasonable application" prong if the state court correctly identified the governing Supreme Court principle but unreasonably applied it to the facts of the case.  *Bell*, 535 U.S. at 694.  Additionally, the "unreasonable application" clause of Section 2254(d) requires the state court's application of clearly established federal law to be "objectively

unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)) (internal quotation marks omitted).

The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). However, "substantial deference" is given to the state trial court's factual findings. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). In other words, if reasonable minds reviewing the record might disagree about the state court's factual findings, that would not be sufficient to supersede the state court's determination on habeas review. *Id.*; *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence.") (internal quotation marks and citation omitted).

A federal court evaluates the decision of the highest state court to make its habeas determination. *See Ylst*, 501 U.S. at 803–06. However, if no reasoned decision from the highest state court exists, the Court "looks through" the unreasoned judgment to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *Id.* at 805–06.

## III. DISCUSSION

Petitioner requests habeas relief on three grounds, contending: (1) at jury selection, the prosecutor engaged in purposeful gender-based discrimination in exercising peremptory challenges against male jurors, in violation of the Fourteenth Amendment equal protection clause as set forth in *Batson v. Kentucky*; (2) the trial court erroneously instructed the jury they could not convict Petitioner of involuntary manslaughter unless they first found her not guilty of voluntary manslaughter, which deprived her of her right to present a complete defense and had a substantial and injurious effect on the verdict; and (3) her defense attorney at trial provided ineffective assistance of counsel by failing to object to the prosecutor's statements during closing argument that the accidental discharge of a firearm amounts to implied malice.

**A. Ground One:** *Batson* **Motions**

Petitioner asserts the Court of Appeal improperly upheld the trial court's denial of her motions under *Batson v. Kentucky* concerning the peremptory challenges the prosecutor exercised against four male jurors. According to Petitioner, male jurors were generally more favorable to Petitioner during her first trial, which motivated the prosecution to exercise peremptory challenges against men. Petitioner argues that the Court of Appeal relied upon reasons unsupported by the record to uphold the trial court's finding that the prosecutor did not discriminate against men, and that the record instead reveals that the prosecutor's peremptory strikes against these four male jurors were motivated by gender-based discrimination.

**1. Legal Standard**

The Equal Protection clause of the Fourteenth Amendment prevents a prosecutor from dismissing potential jurors because of their gender. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *J.E.B. v. Ala. Ex rel. T.B.*, 511 U.S. 127, 129 (1994) (extending the holding from *Batson* to challenges based on potential jurors' gender). There are three steps to the *Batson* inquiry: First, the defendant first "must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose;" second, the prosecutor must offer permissible gender-neutral justifications to explain the exclusion; and third, the trial court must resolve whether the defendant has proved purposeful discrimination. *Johnson v. California*, 545 U.S. 162, 169 (1994) (internal citations and footnotes omitted); *see also J.E.B.*, 511 U.S. at 144–45.

As Petitioner made a prima facie case of gender discrimination and the prosecutor offered gender-neutral justifications for striking the four potential jurors, the Petition challenges the Court of Appeal and trial court's application of the third step of the *Batson* inquiry. At the third step of *Batson*, "the trial court determines whether the opponent of the strike has carried his [or her] burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see also United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003). "In the typical peremptory challenge inquiry, the decisive question will

be whether counsel's [gender]-neutral explanation for a peremptory challenge should be believed." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Cockrell*") (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion)); *see also Purkett*, 514 U.S. at 768. The proponent of a challenge "'must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges," and such reasoning must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98, n.20 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). In evaluating the legitimacy of the proffered explanations, the trial court will often consider "the prosecutor's demeanor; [] how reasonable, or how improbable, the explanations are; and [] whether the proffered rationale has some basis in accepted trial strategy." *Cockrell*, 537 U.S. at 339. The court may also take into account whether an unexcused juror and an excused juror have similar characteristics or qualities, *Foster v. Chatman*, 136 S.Ct. 1737, 1754 (2016), and whether the prosecutor or his or her department has a history of discriminatory practices in jury selection, *Miller-El v. Dretke*, 545 U.S. 231, 253 (2005) ("*Miller-El*").

On habeas review, trial court *Batson* determinations "are presumed correct absent clear and convincing evidence to the contrary," and therefore significant "[d]eference is necessary because a reviewing court, which analyzes only transcripts from *voir dire*, is not as well positioned as the trial court to make credibility determinations." *Cockrell*, 537 U.S. at 339–40 ("Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference" to "[f]actual determinations by state courts[.]"). While deference to a trial court's decision is warranted, "it does not by definition preclude relief" as "the federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.* at 340.

In applying this doubly deferential standard of review, the Court proceeds in two steps. *Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016), cert. denied, 137 S. Ct. 486 (2016) (citing *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013)). First, the

court reviews "the relevant portions of the record and use[s] ordinary analytic tools to evaluate the prosecutor's [gender]-neutral explanations," considering whether the prosecutor's reasons are contrary to the evidence of record, based on mischaracterizations of a prospective juror's testimony, or belied by a comparative juror analysis between the stricken jurors and those jurors who were permitted to serve, on the one hand, or whether evidence in the record shows at least some of the prosecutor's reasons were "permissible and plausible," on the other hand.  *Id.* (citing *Purkett*, 514 U.S. at 768; *Miller-El*, 545 U.S. at 244; and *Rice v. Collins*, 546 U.S. 333, 341 (2006)).  Second, having reviewed the record, the reviewing court turns to the state appellate court's decision and asks "whether the state appellate court was objectively unreasonable in upholding the trial court's determination."  *Id.*

### 2.  Jury Selection and State Courts' Application of *Batson*

During jury selection, the prosecutor exercised the four peremptory challenges at issue against male jurors, identifiable by their initials as J.Z. (Juror No. 19), S.E. (Juror No. 42), W.B. (Juror No. 48), and M.S. (Juror No. 38).  ECF No. 8-7 at 44, 46.  Defense counsel first raised its first motion under *Batson*[2] with regard to the prosecutor's challenge of jurors J.Z. and S.E., as well as two other male potential jurors.  *Id.* at 46. Because the trial court did not find there had been systematic exclusion of men at this stage given the jury's composition of seven women and five men, it did not require the prosecutor to justify the dismissals but allowed the prosecutor to offer reasoning behind these dismissals at his request.  *Id.* at 46–47.  The prosecutor explained he dismissed J.Z. because the juror had "quarreled with [him] on the concept of circumstantial evidence" and the prosecutor had "concerns about his ability to just use plain old common sense." *Id.* at 47–48.  The prosecutor stated that he dismissed S.E. because he was a professor of

---

[2] The parties and court refer to the motion as a *Wheeler* motion, referring to *People v. Wheeler*, 22 Cal.3d 258 (1978), a California precedent holding that peremptory challenges based upon group membership violate a criminal defendant's right to be tried by a jury from a representative cross-section of the community under the California Constitution.  ECF No. 8-7 at 47.  The motions are referred to only as *Batson* motions here for ease of reference.

psychology and therefore might not accept the testimony of the expert witnesses, and because he thought a professor of psychology might be very liberal in a case involving a claim by the defendant that she was raped and abused.  *Id.* at 48.

The trial court proceeded with jury selection.  The prosecutor exercised another peremptory challenge against a man, juror W.B., and the defense counsel raised another motion under *Batson*.  *Id.* at 49–51.  The trial court found that, because the jury was now compromised of four men and eight women, the defense counsel had established a prima facie case of systematic exclusion of men based on their gender.  *Id.* at 51.  The court then asked the prosecutor to provide its justification for the dismissal of juror W.B.  *Id.* The prosecutor explained he had dismissed W.B. because he was overweight, appeared to be an alcoholic or a drug user, appeared to be disheveled, had rotting teeth, had been sweating heavily, was "just a sloppy individual," wore the same sweatpants every day, and was a retired letter carrier, which is "not the type of person a prosecutor would typically find favorable."  *Id.* at 51–52.  While the trial court accepted the prosecutor's reasons for dismissing S.E., J.Z., and the other two men, it did not concur with several of the reasons the prosecutor offered for the dismissal of W.B.; namely, the trial court observed that W.B. was not "disproportionately sweating," that many potential jurors were in casual clothing, and that it did not note W.B. displayed signs of alcohol or drug abuse or had rotting teeth.  *Id.* at 53–54.  Nonetheless, the trial court concluded "that there are independent reasons for the exclusion of the men so far" and denied defense counsel's *Batson* motion at that time.  *Id.* at 54.

The prosecutor then exercised a fourth peremptory challenge against a man, juror M.S., prompting the defense to renew its motion under *Batson*.  *Id.* at 59–60.  Again, the trial court found the defense counsel had made a prima facie showing of a systemic exclusion of men.  *Id.* at 60.  The prosecutor explained that M.S. had raised his hand and "quarreled" with defense counsel about the language of the presumption of innocence, and the prosecutor "was concerned about a juror who was being so technical."  *Id.* at 61.  The trial court pointed out that it seemed that M.S.'s position was more favorable to the

prosecution, and the prosecutor responded that because this was a complicated case, he did not "want a juror on there who is going to quarrel with every single definition." *Id.* at 62. Defense counsel countered that his discussion with M.S. was not a quarrel, and that the prosecutor's justification should not withstand scrutiny given that M.S.'s level of education and intelligence suggested that he would not have a problem understanding the law. *Id.* at 63–65. The trial court noted that it would not characterize M.S.'s exchange with defense counsel as a "quarrel," but rather "a discussion of the law" and that the prosecutor's justifications were becoming less compelling as jury selection continued. *Id.* at 65–66 The trial court warned the prosecutor that "the ice is about as thin as it can get" and noted that "I think a reviewing court may disagree with my ruling at this point," but accepted the prosecutor's non-discriminatory reasons. *Id.* at 66. The prosecutor made no other challenges and jury selection concluded. *Id.* at 67.

On appeal, the Court of Appeal considered Petitioner's arguments concerning the trial court's denial of Petitioner's *Batson* motions with respect to four of the prospective male jurors: M.S., W.B., S.E., and J.Z. Ct. App. Op. at 16. With respect to M.S., Petitioner claimed the "trial court properly rejected several of the prosecutor's stated reasons for dismissing M.S. and argue[d] that insufficient evidence supports the prosecutor's remaining rationales." *Id.* The Court of Appeal noted the prosecutor justified the peremptory challenge against M.S. based on the juror's "overly technical view of the complicated legal questions the jury would be expected to tackle at the end of the trial." *Id.* at 17. The Attorney General supplemented this reasoning on appeal by claiming that M.S. "described himself as a fence sitter" and thus posed a risk of remaining "'overly neutral' and unwilling to take a position on either side of the law." *Id.* The Court of Appeal affirmed the trial court's determination as to M.S., finding that not wanting a "juror who [was] going to quarrel with every single definition" of the complicated legal issues at trial was a valid, gender-neutral reason for the peremptory challenge and was justified by the statements M.S. had made during jury selection. *Id.*

The Court of Appeal next considered the prosecutor's peremptory challenge of W.B. *Id.* at 17–18. The Court of Appeal agreed with Petitioner that the trial court had rejected the prosecutor's justifications relating to W.B.'s appearance and therefore evaluated only the justifications based on W.B.'s weight and his former job as a postal worker. *Id.* at 18. The Court of Appeal found that these reasons "were gender-neutral and non-discriminatory, and formed an appropriate basis for the prosecution's excusal of W.B. and the trial court's conclusion that the excusal was not improperly biased." *Id.*

Petitioner also argued that the prosecutor's justifications for S.E.'s excusal was pretextual, as his background in psychology had no bearing on S.E.'s ability to accept the testimony of the expert witnesses. *Id.* Petitioner also noted that another juror, a woman, had a background in psychology but was not excused from the jury. *Id.* at 18–19. The court noted that "a potential juror's 'educational background, interest, and experience in the field of psychology' may be a 'neutral reason justifying his excusal.'" *Id.* at 19 (quoting *People v. DeHoyos*, 57 Cal.4th 79, 110 (2013)). The Court of Appeal further reasoned that "[t]he fact that S.E.'s field of study was not identical to that of the experts does not show the prosecution's justification was pretextual" and accepted the Attorney General's assertion that S.E.'s background "'gave him uncommonly specialized knowledge'" and sufficed as a valid gender-neutral basis for S.E.'s dismissal. *Id.* The Court of Appeal additionally found "no evidence that this female juror had the same kind of specialized knowledge that E.S., a professor in the field of psychology, had." *Id.* Based on this, the Court of Appeal affirmed the trial court's finding. *Id.*

Finally, Petitioner argued the prosecutor's justification for his peremptory challenge of J.Z. was pretextual, noting that although J.Z. had expressed some confusion over the issue of circumstantial evidence in the early stages of jury selection, "because J.Z. later stated he would follow the law, his prior statements about circumstantial evidence [were] not relevant." *Id.* at 20. The Court of Appeal upheld the trial court's denial of Petitioner's *Batson* motion with respect to J.Z., noting the "fact that J.Z. later indicated willingness to follow the law did not negate the comments that caused the

14

prosecutor's concern" and did not persuade the court that the challenge to J.Z. was improper. *Id.* The Court of Appeal also noted that "the other juror who had expressed confusion over the concept of circumstantial evidence and remained on the jury was also male," which it found to undermine Petitioner's argument. *Id.*

Ultimately, the Court of Appeal determined that there was sufficient evidence to support the trial court's finding that the prosecution did not systematically discriminate against men, noting that "[t]he trial court engaged in a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered by the prosecution and found the articulated gender-neutral reasons to be credible." *Id.* at 21.

### 3. Analysis

Petitioner claims the Court of Appeal unreasonably applied step three of *Batson* to Petitioner's motions based on a misinterpretation of facts available from the trial court record. Respondent opposes, arguing that Petitioner has failed to show the Court of Appeal's determination was contrary to *Batson*, unreasonably applied *Batson*, or relied on unreasonable determinations of the facts. The Court will evaluate Petitioner's claims relating to each potential juror in turn.

#### i. S.E.

According to the prosecutor, the peremptory challenge to S.E. was due to the fact that S.E. was a professor of psychology. Petitioner argues that the Court of Appeal improperly affirmed the trial court's upholding of the prosecution's justifications for excusing S.E. for five reasons: first, the prosecutor did not question S.E. to determine if he was in fact "liberal" or had any views on domestic violence; second, the fact that there would be dueling psychological experts belies the prosecutor's suggestion that people with a background in psychology would be inclined to excuse criminal conduct; third, the prosecutor's statement that S.E. would "quarrel" with the psychological experts is not logical because the psychological experts would give opposing testimony; fourth, the prosecutor did not challenge a female juror who had spent five years studying psychology at a university; and fifth, S.E. had no background in the field of domestic abuse.

As mentioned above, under Section 2254(d)(2), the Court can only "order habeas relief only where a state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'" and "the petitioner has the burden of rebutting the presumption" that state court factual findings are correct "by clear and convincing evidence." *McDaniels v. Kirkland*, 839 F.3d 806, 809 (9th Cir. 2016) (quoting 28 U.S.C. § 2254(d)(2); *Davis*, 576 U.S. at 269). The Court cannot find that the Court of Appeal's decision as to S.E. was based on an unreasonable determination of the facts. Given that the case hinged on the psychological state of Petitioner, it was not unreasonable for the trial court to find that the prosecutor's justifications based on S.E.'s background in psychology were legitimate, even if the prosecutor did not ask further questions about S.E.'s background, as he had already made clear that he had advanced training in psychology, even if not in clinical settings. *Cf. Ngo v. Giurbino*, 651 F.3d 1112, 1117 (9th Cir. 2011) (noting that "striking a juror who is 'overly educated' is sufficiently race-neutral to shift the burden back on the defendant to prove purposeful discrimination" and finding petitioner had failed to meet that burden).

Nor is the prosecutor's justification relating to the psychological experts clearly invalid because both the prosecution and defense planned to present experts. The prosecutor may have had valid concerns about the impact of S.E.'s profession on his ability to fairly consider the testimony of the psychological experts. Although S.E. would have ultimately had to agree with one psychological expert over the other, just like any other juror, the prosecutor's concern that S.E. had too much outside knowledge based on his background in the psychology field to be an ideal juror is not illogical. *Cf. United States v. Evans*, 192 F.3d 698, 700 (7th Cir. 1999) (affirming trial court determination that "[u]nderstandably, the government would not want someone who might have specialized knowledge in this area second guessing the government's witnesses during deliberation").

It was also not objectively unreasonable for the Court of Appeal to differentiate S.E. from the female juror who had some background in psychology.  A person with a career and advanced degree in psychology, even if not in the sub-field directly applicable to the case, has a qualitatively different background than someone who did not earn a degree in the field, and the Court of Appeal did not unreasonably determine that it was the two potential jurors' backgrounds, rather than their genders, that led the prosecutor to excuse one and not the other.  *Cf. Sifuentes*, 825 F.3d at 527 (finding prosecutor could have been reasonably concerned about seating juror with law degree and not harbor same concerns about juror with undergraduate legal training).  Lastly, although S.E.'s experience as a child abuse investigator for one year approximately 25 years ago does not render him an expert on domestic violence, his lack of recent involvement in the domestic violence field does not indicate the prosecutor's justifications arising from S.E.'s professional background were pretextual.  *See* ECF No. 8-6 at 63.

Accordingly, the Court finds that the Court of Appeal did not unreasonably apply clearly established law or make or rely on unreasonable factual determinations when it affirmed the trial court's finding that the challenge to S.E. was not motivated by gender.

  *ii.*  *J.Z.*

The prosecutor's rationale for excusing J.Z. was that "he quarreled with [the prosecutor] on the concept of circumstantial evidence," and the prosecutor had "some very valid concerns about his ability to just use plain old common sense."  ECF No. 8-7 at 47–48.  Petitioner contends that the Court of Appeal and trial court unreasonably applied *Batson* with respect to J.Z. for four reasons: first, the prosecutor's rationale that J.Z. may have trouble using common sense was unsupported by the record; second, the record does not indicate that J.Z. was going to have difficulty with the concept of circumstantial evidence; third, another juror whom the prosecutor did not challenge made similar statements about circumstantial evidence; and fourth, J.Z.'s statements about circumstantial evidence during jury selection were correct.

In support of Petitioner's first argument that the prosecutor's justification that J.Z. could not use common sense is contrary to the record, she contends that "neither the trial court nor the Court of Appeal found the reason related to inability to use common sense valid." ECF No. 2 at 35. The Court notes that although neither court expressly agreed with the prosecutor's statement that J.Z. appeared to lack common sense, neither found the justification pretextual either. ECF No. 8-7 at 53; Ct. App. Op. at 20. Based on a review of the record, the Court does not find the prosecutor's justification based on J.Z.'s ability to use common sense to be without support. Lacking common sense does not just signify subscribing to bizarre views or magical thinking, as Petitioner asserts; even highly intelligent people may be considered to lack common sense, and the term "common sense" may be used in contrast to more abstract thinking that is not based upon simple reasoning.[3] The prosecutor's reasoning that J.Z. may not be able to use common sense seems to be drawn from J.Z.'s extended discussion with the prosecutor about circumstantial evidence. For example, during that discussion, in response to the prosecutor's example that one's trash going missing the morning of garbage day could be circumstantial evidence that the trash had been picked up by garbage collectors, J.Z. suggested that an alternative reasonable explanation could be that someone stole his trash in order to steal his identity. ECF No. 8-7 at 25–26. The prosecutor could have taken this statement, as well as others in which he expressed doubt about the use of circumstantial evidence, to suggest that J.Z. would not take a common-sense approach to evaluating circumstantial evidence. Whether or not this was an accurate view of J.Z., the Court cannot find that the prosecutor's justification based on his common sense was so without basis in the record to indicate the trial court's findings were without evidentiary foundation.

---

[3] *See Common Sense*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/common%20sense (defining common sense as "sound and prudent judgment based on a simple perception of the situation or facts").

Likewise, the Court does not find that Petitioner has rebutted the presumption of correctness accorded to the trial court's finding that J.Z. "was going to have some difficulty with circumstantial evidence." *Id.* at 53. J.Z. indeed expressed doubt multiple times about whether he could convict a defendant based only on circumstantial evidence, and although he did ultimately state he "believe[d] that [he] could make a judgment based on the fact that nothing in life is certain," it was not unreasonable for the trial court to accept the prosecutor's concern that the exchange with J.Z. reflected that he may be less willing to convict based on circumstantial evidence. *Id.* at 26–27 ("I want to make it clear the pieces of the puzzle have to fit very well for me."). And regardless of whether J.Z.'s "views about circumstantial evidence actually were correct," the prosecutor could have held valid concerns that a potential juror who felt "a little uncomfortable convicting someone solely on circumstantial evidence" would not be an ideal juror for the prosecution in a case that relied on circumstantial evidence. *Id.* at 26; ECF No. 2 at 28.

Petitioner's argument regarding the other male juror who expressed doubts about circumstantial evidence (Juror No. 24) merits a closer look. The Court of Appeal found that the fact that another man was not challenged for similar reasons "runs contrary to [Petitioner's] argument that the prosecution systematically discriminated against male jurors." Ct. App. Op. at 20. Because both J.Z. and Juror No. 24 were members of the same purportedly targeted group, a comparative juror analysis revealing that the prosecutor treated the two differently would not be as probative of discriminatory intent as it would be were Juror No. 24 a woman. *See Cook v. LaMarque*, 593 F.3d 810, 818 (9th Cir. 2010) ("Juror 2 is also African American and therefore provides a weak basis for comparison."). However, just because a prosecutor does not exercise a peremptory challenge against all members of the targeted group does not mean there can be no systematic discrimination. *See Lewis v. Lewis*, 321 F.3d 824, 834 n.39 (9th Cir. 2003). As the trial court noted, "the ice [was] about as thin as it can get" after the prosecutor excused a sixth man and left the court with "very few men" on the panel. ECF No. 8-7 at 60–62. A prosecutor with a discriminatory purpose might seek to excuse members

outside of the targeted group, or may not challenge certain members of the targeted group, in order to avoid arousing suspicion. If the prosecutor cited a reason for excusing J.Z. that equally applied to Juror No. 24, that could indicate the reason offered was a pretext, even if not as strongly as it would if Juror No. 24 had been a woman. The Court therefore disagrees with the Court of Appeal's analysis on this point.

The Court will thus consider whether Juror No. 24 and J.Z. were comparable such that the prosecutor's excusal of J.Z. was clearly pretextual. Petitioner points out that Juror No. 24 also made comments reflecting that he was not comfortable convicting based solely on circumstantial evidence. *Id.* at 29 ("Circumstantial evidence, as [J.Z.] pointed out, would have to be very, very, very strong to convict, it seems to me."). However, Juror No. 24 apparently misunderstood the definition of circumstantial evidence at the time he made that statement. He indicated he would not need a witness to the murder, but something like fingerprints, and the prosecutor then clarified that fingerprints are circumstantial. *Id.* at 29–30. Juror No. 24 then indicated that he was okay with the concept. *Id.* at 30. The prosecutor could have viewed Juror No. 24's resistance to circumstantial evidence as one arising from a misunderstanding, and J.Z.'s as more fundamental, stemming from his belief that "nothing in life is certain." *Id.* at 27. The trial court and Court of Appeal could thus reasonably find that the prosecutor's reason for excusing J.Z. was not pretextual, even though the prosecutor also had an exchange with Juror No. 24 about circumstantial evidence, because their statements on circumstantial evidence were materially different.

The Court therefore does not find that the trial court's overruling of Petitioner's *Batson* motion with respect to J.Z. was based on an unreasonable evidentiary foundation or was an unreasonable application of clearly established federal law.

### iii. W.B.

The prosecutor listed a number of reasons for excusing W.B., including that "he is a larger individual," "appears to be someone who either is a drug user or is an alcoholic," "appears disheveled," "seems to be disproportionately sweating," "looks like a person

20

who has teeth rot and is, quite frankly, just a sloppy individual," and "is a retired letter carrier," which is "not the type of person a prosecutor would typically find favorable." ECF No. 8-7 at 51–52.

Petitioner presents three arguments to show that the trial court and Court of Appeal made unreasonable errors with respect to W.B.: first, the prosecutor cited several reasons that the trial court found inapplicable, suggesting the other reasons were pretextual; second, a potential juror's weight is not a valid reason for a peremptory challenge; and third, the prosecutor did not explain why W.B.'s former occupation as a postal worker would make him an unfavorable juror for the prosecution.

When some of the "proffered reasons [for a peremptory challenge] do not hold up under judicial scrutiny," this may "militate[] against their sufficiency" at step three of a *Batson* analysis, though the presence of illegitimate reasons is not dispositive. *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989); *see also Lewis*, 321 F.3d at 833; *Cook*, 593 F.3d at 819 (noting that although "the prosecutor gave four legitimate and two illegitimate grounds for striking" the potential juror, "careful review of the record ultimately supports the conclusion that the prosecutor was sincerely and justifiably concerned" about the potential juror's views).

With respect to W.B.'s sweating, the trial court noted it had been very hot in the courtroom and that other venire persons were also sweating such that the observation that W.B. "seems to be disproportionately sweating," may not have been confined to W.B. ECF No. 8-7 at 53. While not accepting this reason for excusing W.B., the trial court did not find that it was pretextual as a cover for gender discrimination. *Id.* at 53–54.

The trial court also indicated that "I don't necessarily think that he's an alcoholic or a drug user in any way", ECF No. 8-7 at 53–54, which does not necessarily imply that the prosecutor had invented this reason. *Cf. Thaler v. Haynes*, 559 U.S. 43, 48 (2010) ("*Batson* plainly did not . . . hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor.").

The Court turns to Petitioner's contention that W.B.'s weight was not a valid reason to challenge him and was pretextual.  Some courts have found justifications relating to a potential juror's weight to be valid, while others have found them pretextual. *Compare Wynn v. Giurbino*, 220 F. App'x 633, 634 (9th Cir. 2007) (finding that prosecutor's justification, "as far as people who are overweight, women who are overweight, I feel that people who do not take care of themselves causes me concern as far as being able to sit on a jury," was a good faith reason for striking prospective jurors) *with Dolphy v. Mantello*, 552 F.3d 236, 239 (2d Cir. 2009) (noting that prosecutor's explanation that overweight jurors tend to favor the defense "lends itself to pretext"). Although the Second Circuit in *Dolphy* noted that the weight-based justification appeared pretextual, the court held that there had been no adjudication of the *Batson* claim on the merits because the trial court had failed to reach *Batson* step three and assess the credibility of the explanation.  *Id.*  Unlike in *Dolphy*, the record in this case reflects that the trial court considered the validity of the prosecutor's arguments, as is required under step three of the *Batson* inquiry, though it did not make a specific finding as to which "independent reasons" were credible justifications for W.B.'s excusal.  ECF No. 8-7 at 54.

It is not apparent from either the record or Respondent's Answer why W.B.'s weight would affect W.B.'s favorability to the prosecution, independent of the appearance-based factors that the trial court discounted.  ECF No. 7-1, at 25.  Here, the prosecutor referenced W.B.'s weight[4] in connection with the appearance-based grounds that the trial court discounted and appeared to suggest that W.B. was a person who did not take care of himself.  ECF No. 8-7 at 51–52 (describing him as "sloppy" and "dirty").

---

[4] Although Petitioner notes that two-thirds of the U.S. population is overweight or obese, the trial court did not disagree with the prosecutor's statement that W.B. was "a larger individual" despite disagreeing that he was "disproportionately sweating," suggesting that W.B. may have indeed been larger than the typical juror.

1    Ultimately, it is possible that the prosecutor harbored stereotypes about people who
2    are overweight which does not compel the conclusion that the concern relating to W.B.'s
3    weight was a pretext for gender discrimination.  Since the trial court did not supply
4    details when it found that there were independent reasons for the exclusion of W.B., it is
5    challenging for this Court to discern if it was W.B.'s weight or his prior profession as a
6    postal worker that led the trial court to that conclusion.  *See* ECF No. 8-7 at 54.
7    Meanwhile, the Court of Appeal found that "these rationales [weight and former job]
8    were neutral and nondiscriminatory, and formed an appropriate basis for the
9    prosecution's excusal of W.B. and the trial court's conclusion that the excusal was not
10   improperly biased."  Ct. App. Op. at 17–18.

11   Finally, the Court turns to the prosecutor's explanation that W.B. would not be
12   favorable to the prosecution because he was a retired postal worker.  The prosecutor did
13   not elaborate on the reason why a retired postal worker was "not the type of person a
14   prosecutor would typically find favorable."  ECF No. 8-7 at 52.  "[A] juror's occupation
15   is generally a legitimate reason for a peremptory challenge."  *Cook*, 593 F.3d at 818; *cf.*
16   *J.E.B.*, 511 U.S. at 142 n. 14 (distinguishing peremptory challenges based on race and
17   gender from challenges based on occupation).  Courts have varied in concluding whether
18   a potential juror's profession as a postal worker in particular is a credible basis for
19   excusal.  *See Sifuentes*, 825 F.3d at 531 (noting that "the prosecutor's stereotype of postal
20   workers [as lazy] is not persuasive," but finding "the trial court could have reasonably
21   determined that the prosecutor provided a number of other permissible and plausible
22   race-neutral reasons") (internal quotation marks omitted); *Jamerson*, 713 F.3d at 1235
23   (9th Cir. 2013) ("[T]he prosecutor stated that she previously had a 'terrible personal
24   experience' with a postal worker on a jury and, based on his demeanor observations, the
25   trial judge found her credible; under our doubly deferential standard of review, we find
26   no reason to question this conclusion."); *Smulls v. Roper*, 535 F.3d 853, 865 (8th Cir.
27   2008) (crediting prosecutor's justification that he struck potential juror because she
28   worked in the mail department of a corporation, "which he equated with postal service

workers who he asserted generally lack ambition"). The prosecutor in this case did not clarify why he felt that postal workers were generally unfavorable to the prosecution or cite to personal experiences with postal workers, but the trial court presumably found this prosecutor's opposition to seating postal workers was not pretext. Even if some other prosecutors disagreed with this prosecutor's assessment of postal worker's suitability as jurors, as may have been the case given W.B.'s past jury service, it would not be objectively unreasonable for the trial court to credit this prosecutor's concerns about having a postal worker on the jury.

Ideally, the trial court would have made a fuller record with respect to W.B.'s excusal. However, given that there is a legitimate reason for the trial court's determination, the Court does not find that the state court's conclusion with respect to W.B. was objectively unreasonable.

*iv.* *M.S.*

The prosecutor told the trial court he exercised a peremptory challenge against M.S. because he raised his hand to "quarrel" with defense counsel about the language of the presumption of innocence, and the prosecutor was "concerned about a juror who was being so technical" and would quarrel with the attorneys' definition of law. ECF No. 8-7 at 60–62. Petitioner presents three arguments as to why the prosecutor's challenge to M.S. was improper: first, because the trial court disagreed that M.S. had quarreled with defense counsel, the prosecutor's justification was without support in the record; second, the record indicates M.S. actually agreed with the presumption of innocence and would apply it; and third, the record does not reflect M.S. was going to disagree with any other legal concept and the prosecutor did not ask follow-up questions to ascertain whether he would have a problem following instructions, suggesting that reason was pretextual.

Petitioner is correct that the trial court "disagree[d] with the characterization of the back and forth" between M.S. and defense counsel and stated that it "wouldn't characterize it as a quarrel." *Id.* at 65. The trial court further stated, "I don't find your reasons incredibly compelling to dismiss [M.S.]" *Id.* However, despite stating that "I

24

think it's a close call" and "I think that a reviewing court may disagree with my ruling at this point," the trial court ultimately determined that it did "not find the systemic exclusion based only on gender" and accepted the prosecutor's reasons. *Id.* at 66. Because the trial court did not find the discussion between M.S. and defense counsel to be a "quarrel," it seemingly accepted the prosecutor's additional reasoning that M.S. would be overly technical about legal definitions. Although the distinction between a "quarrel" and a discussion about the law may be murky at best, the Court accepts Petitioner's contention that the Court of Appeals inaccurately assessed the trial court record when it suggested that the trial court upheld the prosecutor's justification on the basis that M.S. was somehow quarrelsome. *See* Ct. App. Op. at 17.

As for Petitioner's second argument, the Court notes that the prosecutor suggested that the issue was not specifically with M.S.'s ability to apply the presumption of innocence, but rather the fact that M.S. affirmatively raised his hand to ask about (and in the prosecution's view, quarrel with) a definition of law which could implicate his ability to accept other complicated legal definitions. ECF No. 8-7 at 62. However, because the parties dispute this point in the briefing, the Court will address it. M.S. did volunteer that "I have a problem with your wording, your legal wording, [that] she is presumed innocent," and that "unfortunately . . . I accept she's neither innocent or guilty." ECF No. 8-6 at 181. After defense counsel explained the presumption of innocence and the state's burden, and M.S. explained his point of view, stating he does not "preconceive something to be good or bad," M.S. eventually said that "if the state can't prove her guilty, then my decision would be in her favor." *Id.* at 181–83. After that statement, however, he indicated that "there may be a fine line between what [defense counsel is] saying" and his own view of neutrality, but then reiterated that "I think at the end of the day, if the state can't prove her guilty, then I will allow her to, you know, be free." *Id.* at 183. Although M.S. did indicate he was willing to follow the law with respect to the presumption of innocence and that his "problem" with the presumption's wording was subtle, the Court disagrees with Petitioner that the record reflects he was in "complete agreement" with the

presumption of innocence.  *Id.* at 181–82, ECF No. 2 at 23.  His statements suggest that prior to receiving evidence, he would not presume a defendant to be innocent, as the law requires.  ECF No. 8-6 at 182.

While M.S.'s minor disagreement with the presumption of evidence may not on its own have been sufficient to support the trial judge's finding that the prosecutor's explanation was not pretextual, the prosecutor also argued that this discussion indicated that M.S. may take an overly technical approach and quarrel with other legal definitions offered by counsel.  ECF No. 8-7 at 62.  Contrary to Petitioner's argument, this argument is not without support in the record.  Despite the trial court's finding that M.S. did not engage in a "quarrel," M.S. did volunteer that he had a "problem" with a legal definition on a point that, according to Petitioner, was semantical.  There is therefore not a complete absence of support for the prosecutor's expectation that M.S. may raise technical problems with other legal definitions during the trial.  Petitioner notes that the prosecutor did not ask follow-up questions of M.S. on this topic and asserts this reveals that the prosecutor was not truly concerned about M.S.'s ability to follow instructions.  The lack of follow-up questions regarding the purported reasons for a challenge can show a prosecutor was not truly interested in confirming his or her speculations about the prospective juror's unfavourability to the prosecution.  *See Miller-El*, 545 U.S. at 244.  In *Miller-El*, the Court found that the prosecutor "mischaracterized" the potential juror's statement about his support for the death penalty, and noted that, even if this was a misunderstanding, his failure to ask questions suggested an "ulterior reason for keeping [him] off the jury."  *Id.*  However, in this case, asking follow-up questions of M.S. would not necessarily clear up the prosecutor's concerns about M.S.'s personality traits that the prosecution found unfavorable and were demonstrated in M.S.'s extended discussion with defense counsel.  *Cf. Currie v. Adams*, 149 F. App'x 615, 619 (9th Cir. 2005) (noting that prosecutor asked no questions of potential juror and "simply relied on the one-word answer in her questionnaire that was at best ambiguous" about her views on the death penalty); *Kesser v. Cambra*, 465 F.3d 351, 364–65 (9th Cir. 2006) (noting

26

prosecutor's lack of follow-up questions about Native American potential juror's alleged pretentious attitude as one of many indications of a *Batson* violation, along with the absence of support in the record to show she was pretentious, a comparative juror analysis showing that numerous jurors who made similar statements were not challenged, an "outburst" by the prosecutor during the *Batson* hearing criticizing Native American institutions' influence, and lack of explanation as to why being pretentious about her work would render her unsuitable for the jury).

The record reflects that the trial court was wavering on its decision as to the credibility of the prosecution's explanations. *E.g.*, ECF No. 8-7 at 65 ("I will tell you, I am struggling with this decision right now."). However, after careful consideration, it determined that the prosecutor's reasons were credible. *Id.* at 66. This Court, like the trial court, recognizes that the credibility question was a close call in this case. But the Court cannot say that the trial court, having evidence of the prosecutor's demeanor at its disposal, made an objectively unreasonable determination of fact in finding the prosecutor's explanation credible. *See Cockrell*, 537 U.S. at 339. Although reasonable judges may have come to a different conclusion than the trial court in this case, there was an evidentiary basis for its decision, and Petitioner has not rebutted the presumption of correctness with clear and convincing evidence that the trial court erred. The Court does not find that "the trial court had no permissible alternative but to reject the prosecutor's [gender]-neutral justifications and conclude [Petitioner] had shown a *Batson* violation." *Collins*, 546 U.S. at 334.

For the foregoing reasons, the Court cannot find that the trial court's denial of Petitioner's *Batson* motions or the Court of Appeal's affirmance unreasonably applied *Batson*, was based on an unreasonable evidentiary foundation, or was rebutted by clear and convincing evidence. 28 U.S.C. §§ 2254(d), (e)(1). Accordingly, the Court ADOPTS the Magistrate Judge's R&R, OVERRULES Petitioner's Objections to the R&R, and DENIES the relief with respect to the first ground stated in the Petition.

\ \ \

### B. Ground Two: Jury Instruction Error

Petitioner contends the trial court erroneously instructed the jury in a manner that suggested involuntary manslaughter was a lesser included offense of voluntary manslaughter, effectively preventing the jury from considering whether Petitioner was guilty of involuntary manslaughter until after considering whether Petitioner was guilty of voluntary manslaughter.  ECF No. 2 at 39.  Petitioner claims this error in instruction violated her right to a meaningful opportunity to present a complete defense and reduced the prosecutor's burden of proving malice on Petitioner's behalf, and thus had a substantially injurious effect on the verdict.  *Id.*  Respondent concedes that the jury instruction at issue was erroneous but contends that the error was harmless.  ECF No. 7-1 at 32–33.

### 1. Legal Standard

In general, "jury instructions in State trials are matters of State law."  *Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  A petitioner will only be granted habeas relief when "[an] ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The Due Process Clause of the Fourteenth Amendment guarantees, in part, "criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 476 U.S. 479, 485 (1984)).  Thus, if an error in jury instruction prevented a petitioner from presenting a complete defense, such an error will have proximately caused a constitutional violation under the Due Process Clause.  *Cf. Hanna v. Riveland*, 87 F.3d 1034, 1037 (9th Cir. 1996).

For habeas cases involving constitutional trial errors, habeas relief is generally available only when the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam).  "[T]he *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner

contests a state court's determination that a constitutional error was harmless under" the direct review standard, and thus the Court need not "formally" apply both the *Brecht* test and AEDPA review of the state court's findings on direct review. *Ayala*, 576 U.S. at 268 (quoting *Fry v. Pliler*, 551 U.S. 112, 120 (2007)); *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017). "If, reviewing the facts as a whole," the Court is "able to determine with fair assurance that the judgment was not substantially swayed by the error, [it] may conclude that the error was harmless." *Hurd v. Terhune*, 619 F.3d 1080, 1090 (9th Cir. 2010). "Otherwise," the Court "must conclude that the petitioner's rights were substantially and injuriously affected." *Id.*; *cf. O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.").

### 2. Jury Instructions and State Court Opinion

As both Parties agree, the trial court's jury instructions for "Deliberations and Completion of Verdict Forms" was erroneous. The instruction at issue read:

> If all of you agree that the defendant is not guilty of second degree murder and not guilty of voluntary manslaughter, but all of you agree that the defendant is guilty of involuntary manslaughter, complete and sign the [verdict] forms for not guilty of second degree murder, not guilty of manslaughter, and complete and sign the form for guilty of involuntary manslaughter.

ECF No. 2 at 30–40; ECF No. 8-2 at 192–93. Petitioner argued on direct appeal that the instruction suggested to the jury that they could not find the crime to be involuntary manslaughter unless they first found the offense was not second-degree murder because it was voluntary manslaughter based on imperfect self-defense or heat of passion, issues which have nothing to do with the offense of involuntary manslaughter. Petitioner argued that the error denied her the right to present a complete defense by effectively precluding the jury from finding the offense to be involuntary manslaughter.

Respondent conceded on direct appeal that the instruction was erroneous "because it potentially suggested to the jury that it must determine the issue of voluntary manslaughter before it considered involuntary manslaughter," and "could have led the jury to believe that involuntary manslaughter was a lesser included offense of murder *and* voluntary manslaughter," which it is not under California law.  ECF No. 7-1 at 32–33 (citing *People v. Orr*, 22 Cal. App. 4th 780 (1994)).  However, Respondent contended that the error was harmless given that the jury expressly found Petitioner acted with malice, precluding a verdict of involuntary manslaughter, because the jury convicted Petitioner of second-degree murder and found true the allegation that she intended to discharge the firearm.

The Court of Appeal found that the erroneous jury instruction was harmless, reasoning that "the jury's decision to convict [Petitioner] of second-degree murder by finding she acted with either express or implied intent foreclosed the possibility that [Petitioner] might have been found guilty of involuntary manslaughter, even if the erroneous jury instruction had not been given." Ct. App. Op. at 27.  The Court of Appeal thus determined that the error was harmless under any possible standard of review.  *Id.* at 29.

### 3.  Analysis

In the instant habeas petition, Petitioner argues that the trial court's erroneous jury instruction was constitutional error because it lessened the prosecutor's burden of proof on the element of malice by preventing the jury from considering whether Petitioner acted with criminal negligence rather than implied malice, and because it violated Petitioner's right to a meaningful opportunity to present the defense that the crime was not murder because it was involuntary manslaughter instead.  Petitioner argues that reversal is required under *Brecht* because the instruction had a "substantial and injurious effect on the verdict" by effectively precluding the jury from rendering a verdict of involuntary manslaughter.  ECF No. 2 at 43.  Respondent does not challenge Petitioner's claim of constitutional error, but rather contends that the instructional error could not

have affected the verdict because the jury found Petitioner acted with malice by convicting her of second-degree murder, found that she intentionally used a firearm, and "extremely strong" evidence supported her conviction.  ECF No. 7-1 at 36.  For the purposes of the following analysis, the Court presumes that the jury instruction was constitutional error.

As a threshold matter, Petitioner argues that the fact that she was ultimately convicted of second-degree murder is not necessarily dispositive.  Petitioner points to several cases in which California courts found that an error with respect to a manslaughter instruction was not harmless, even though the jury ended up convicting the defendant of murder.  ECF No. 2 at 40 (citing *People v. Thomas*, 218 Cal. App. 4th 630 (2013), *as modified on denial of reh'g* (Aug. 22, 2013); *People v. Ramirez*, 189 Cal. App. 4th 1483 (2010); *People v. Viramontes*, 93 Cal. App. 4th 1256 (2001)).  These cases support Petitioner's argument that the jury's return of a guilty verdict on murder, standing alone, does not necessarily render a jury instruction error on a lesser included offense harmless.  In each case, the California Court of Appeal found an erroneous jury instruction regarding voluntary manslaughter was prejudicial even though the defendant was convicted of murder—meaning the jury had found beyond a reasonable doubt that the defendant acted with malice aforethought.  *See Ramirez*, 189 Cal. App. 4th at 1487–88 (rejecting respondent's argument that "that because the jury found that Ramirez acted willfully, deliberately, and with premeditation" by finding him guilty of first degree murder, "it necessarily found that he did not act under the heat of passion"); *Thomas*, 218 Cal. App. 4th at 641; *Viramontes*, 93 Cal. App. 4th at 1261.

However, the cases differ from Petitioner's circumstances in significant ways.  First, each were on direct appeal, meaning the courts reviewed the convictions under a less deferential standard than applies in habeas review.  *See Brecht*, 507 U.S. at 630, 637–38; *Thomas*, 218 Cal. App. 4th at 477–78; *Ramirez*, 189 Cal. App. 4th at 786–87; *Viramontes*, 93 Cal. App. 4th at 1263–64.  More importantly, the jury instruction errors in these cases were more significant, as they all involved the complete absence of an

instruction.  In *Thomas* and *Ramirez*, the trial court refused to instruct the jury on the "heat of passion" theory of voluntary manslaughter entirely.  *Thomas*, 218 Cal. App. 4th at 644–45; *Ramirez*, 189 Cal. App. 4th at 1484.  In *Viramontes*, the trial court refused to give a voluntary manslaughter instruction related to imperfect self-defense.  *Viramontes*, 93 Cal. App. 4th at 1262.  Here, in contrast, the trial court did provide an instruction on involuntary manslaughter, although it incorrectly suggested that involuntary manslaughter was a lesser-included offense of voluntary manslaughter.  This could have caused confusion, but unlike in the cases cited by Petitioner, the jury was not entirely precluded from considering the offense.

Lastly, all three cases involved the absence of a voluntary manslaughter instruction, rather than an involuntary manslaughter instruction.  Involuntary manslaughter differs from voluntary manslaughter in that for the latter, particular facts relating to either provocation or an erroneous belief of the need for self-defense can 'negate' what would otherwise be express or implied malice.  *See Thomas*, 218 Cal. App. 4th at 643.  For involuntary manslaughter, as Petitioner notes, the mens rea question is a matter of degree between implied malice and criminal negligence.  It is therefore less likely than in the cases cited by Petitioner that the jury failed to consider facts that would distinguish between second degree murder and manslaughter.  In *Thomas* and *Ramirez*, where no "heat of passion" voluntary manslaughter instructions were given, the jury would not have known that facts relating to the defendants' provocation or the existence of a struggle were even relevant.  *See Thomas*, 218 Cal. App. 4th at 646 ("[N]othing in the court's instructions advised the jury it could consider whether Thomas's passion was aroused or his reason obscured on account of the altercation").  Likewise, in *Viramontes*, once the jury determined that the defendant could not reasonably have feared being shot, it would have disregarded any facts related to the defendant's genuine, but unreasonable, belief that he was in imminent peril in the absence of an imperfect self-defense instruction, as such facts otherwise appear irrelevant to the question of whether the defendant acted with malice.  *See Viramontes*, 93 Cal. App. 4th at 1264.  In contrast, the

erroneous instruction would not have caused the jury in Petitioner's case to disregard relevant facts, as the jury would have needed to consider facts relevant to the degree of Petitioner's disregard for human life in coming to the conclusion that Petitioner was guilty of second-degree murder.  That is not to say an instructional error on involuntary manslaughter would never be prejudicial, but it is a crucial distinction.

Moreover, the circumstances of Petitioner's case convince the Court that the erroneous instruction did not have a substantial and injurious effect on the verdict. Although the erroneous instruction could have led the jury to believe they could only turn to involuntary manslaughter after considering voluntary manslaughter, the trial court did initially instruct the jury correctly, and the jury instructions stated that the jury could consider the offenses in any order and correctly noted that the court "can accept a verdict of guilty or not guilty of voluntary or involuntary manslaughter only if all of you have found the defendant not guilty of second degree murder."  ECF No. 8-26 at 151–58; ECF No. 8-2 at 192–93.  The fact that the jury was otherwise correctly instructed on the offenses weighs against Petitioner's argument that the erroneous jury instruction had a substantial effect on the verdict.

The Court accepts Petitioner's argument that the sequencing of the instructions may have caused jurors to compare murder and voluntary manslaughter, and to compare voluntary manslaughter and involuntary manslaughter, but not to directly compare murder and involuntary manslaughter.  However, Petitioner's theory of the case makes it unlikely that the confusing instruction contributed to the jury's decision to find Petitioner guilty of second-degree murder rather than involuntary manslaughter.  Petitioner's involuntary manslaughter theory relied on the jury finding that Petitioner had fired the gun accidentally and only intended to scare the victim, constituting at most criminal negligence.  ECF No. 2 at 44.  However, the jury found that Petitioner intentionally discharged a firearm causing death.  ECF No. 8-2 at 197.  The jury could have determined that this firearm enhancement allegation did not apply and still found Petitioner guilty of second-degree murder if it determined Petitioner did not intentionally

33

discharge the firearm but still acted with a conscious disregard of human life, that is, with implied malice.  If that were the case, it would be conceivable that the jury may not have adequately considered whether Petitioner's unintentional discharge of the firearm constituted criminal negligence, as was Petitioner's theory, as opposed to implied malice. But the jury explicitly found that the discharge of the gun was intentional, which means they did not credit Petitioner's involuntary manslaughter theory which rested on Petitioner's assertion that the gun went off accidentally.[5]   As there is no reason that the jury's finding on the firearm enhancement allegation would have been affected by the erroneous jury instruction, the jury's finding that Petitioner intentionally fired the gun confirms that the instructional error did not affect the verdict.

Accordingly, the Court finds that the erroneous jury instructions, while they may have been somewhat confusing, did not substantially and injuriously influence the verdict.  The Court ADOPTS the Magistrate Judge's R&R, OVERRULES Petitioner's Objections to the R&R, and DENIES the relief with respect to the second ground stated in the Petition.

### C. Ground Three: Ineffective Assistance of Counsel

Petitioner claims her defense counsel provided ineffective assistance of counsel in violation of her Sixth Amendment rights.  ECF No. 2 at 51.  Specifically, she asserts defense counsel's failure to object to the prosecutor's argument that accidental discharge of a firearm amounted to implied malice constituted deficient performance as defense counsel had no tactical reason for neglecting to object.  ECF No. 9-1 at 25–26.  Plaintiff further asserts that this error prejudiced her defense.  ECF No. 2 at 58.  Respondent argues that the prosecutor's statements were not objectionable, defense counsel's decision to object should be considered tactical, and in any case, there is no reasonable

---

[5] Based on the Court's review of the record, Petitioner did not advance an involuntary manslaughter theory that discharge of the firearm may have been intentional but the shooting of the victim nonetheless was only done with criminal negligence.

probability the outcome of the trial would have been different had defense counsel objected.  ECF No. 7-1 at 37.

### 1. Legal Standard

To prevail on a claim that his trial counsel rendered ineffective assistance, a petitioner must demonstrate that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the petitioner's defense.  *Strickland v. Washington*, 466 U.S. 668, 688–93 (1984).  Under the first prong of the *Strickland* test, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, or was "outside the wide range of professional competent assistance." *Id.* at 690. Reviewing courts must apply a "strong presumption" that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also Cullen v. Pinholster*, 131 S.Ct. 1388, 1407 (2011) (courts must give "attorneys the benefit of the doubt" for proceeding as they did).  Under the second prong, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. *Id.* at 687; *United States v. Olson*, 925 F.2d 1170, 1173 (9th Cir. 1991).  "Because failure to meet either prong is fatal to [a defendant's] claim, there is no requirement that [courts] 'address both components of the inquiry if the defendant makes an insufficient showing on one.'" *Gonzalez v. Wong*, 667 F.3d 965, 987 (9th Cir. 2011) (internal quotation marks omitted).  The Supreme Court has recognized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

However, a petitioner's burden on habeas review is even greater.  The petitioner must show that the state court's decision "was 'contrary to, or involved an unreasonable application of,' *Strickland* or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Scott v. Schriro*, 567 F.3d

573, 585 (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)(1) & (2)).  "[I]t is not enough to convince a federal habeas court that, in its independent judgement, the state court decision applied *Strickland* incorrectly." *Bell*, 535 U.S. at 699. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

### 2.  Prosecution's Closing Arguments and Findings of the Court of Appeal

During closing arguments, the prosecution established as its primary theory that Petitioner intentionally shot the victim.  However, the prosecution also noted that Petitioner could be found guilty of murder even if she did not intentionally kill the victim. Petitioner argues that the prosecution's argument was legally flawed.  The Court has identified the following relevant statements from the prosecution's closing argument on the pages of the transcript refenced by Petitioner, to which defense counsel did not object:

> "There's another type of second-degree murder that doesn't even require an intent to kill. It can even be an accidental killing that still makes you guilty of second-degree murder. That's implied malice. It's no intent to kill murder. It can be accidental. . . Even accidental shootings can be second-degree murder under the circumstances that I'll show you in a moment."  ECF No. 8-27 at 58–59.

> "There are two types of second-degree murder, two theories of second-degree murder, two ways you can find her guilty of second-degree murder. The first is through express malice. It's when you intend to kill. The second is through implied malice, it's when you kill accidentally, but you did so while consciously disregarding human life." *Id.* at 63.

> "In order for me to explain to you what malic is or what murder is, I need to explain to you what the reasoning behind murder law is. I think this will help you understand why we hold – call people murderers even when they kill accidentally, as well as when they kill intentionally. The theory is that human life is precious. All of us in our society have a duty of care to protect human life. That means we are not allowed to intentionally take human life, but we are also not allowed to accidentally take human life if we do so with conscious disregard for human life, as I'll show you." *Id.* at 64.

"Even if some of you were to think that Julie Harper didn't intend to kill her husband, that this was, in fact, somehow an accidental shooting, you can still find her guilty of second-degree murder. . . Implied malice sounds a little bit complicated. What it says – this is for accidental shootings – it says the defendant intentionally committed an act, the natural and probable consequences of which are dangerous to human life." *Id.* at 66–67.

"An example of this would be if she chose during this heated argument with her husband to take out that gun and point it at him just to scare him, not to kill him. And during this heated argument, she's pointing a gun at her husband, and she somehow accidentally fired the gun. She is still guilty of second-degree murder by implied malice. Why? Because she has a duty of care to every person in our society to not do dangerous things. She has a duty to not point loaded handguns at people during a heated argument. If she chose to do so and she consciously disregarded human life, she's still guilty of murder." *Id.* at 67–68.

"Recklessly pointing a loaded gun at your husband during a heated argument is second-degree murder,[6] even if you think that the defendant did not intend to kill. . . We will hold you responsible for second-degree murder whether you intend to kill or whether you accidentally kill if you acted with conscious disregard for human life. Because in either example, whether you intended to kill or you accidentally killed while disregarding human life, in both examples, you have malice." *Id.* at 70.

"If I convinced 11 of you that she intended to kill, that's express malice. And I only convinced one of you that it's an accidental shooting in which there is implied malice, she consciously disregarded human life. You are done. You have reached a unanimous verdict because you are unanimous that it's second-degree murder." *Id.* at 71.

"We don't care whether it was express malice, intent to kill; or implied malice, an accidental shooting in which the defendant consciously disregarded human life by having a loaded firearm pointed at another human being during an argument." *Id.* at 77.

"What's Ms. Harper's excuse? She had to go and get the gun. She had to load the gun at some point prior. She had to take it out from wherever she had it and point it

---

6 Defense counsel objected to the prosecution's reference to recklessness. ECF No. 8-27 at 72–75. The trial court rejected defense counsel's argument because it found the prosecution was merely making a factual statement as to what Petitioner did, but accurately stated that a conscious disregard for life was needed to constitute implied malice. *Id.* at 75.

at Jason. As I told you, when we get into that scenario, she's not in a lawful position when she has the gun out. She's making a decision to point a loaded gun at a person during an argument. That's why it's still second-degree murder, in the very least. It's implied malice because she's consciously disregarding human life." ECF No. 8-28 at 115–16.

"If someone were to accidentally be killed [while a person was brandishing a gun], it would be an involuntary manslaughter. Let's say an unexpected result happened, one without conscious disregard for human life. You take out the gun and, brandishing it, you show it in your waistband and you show the gun and it accidentally goes off and fires through the floor and kills someone down below. That's really unexpected. That's involuntary manslaughter.[7]
. . .
You know what Ms. Harper did? She pointed a loaded handgun directly at another human being during this heated argument. You know what that is? That's conscious disregard for human life. It's not involuntary manslaughter. It's second degree murder. Because either she intentionally intended to kill by pulling the trigger of the gun or she accidentally killed while pointed a loaded handgun at another human being. She's consciously disregarding human life. That's why this is, in the very least, a second-degree murder. In the very least, by implied malice, if not express malice." *Id.* at 137–38.

On appeal, Petitioner argued her defense attorney's failure to object to these statements during the prosecutor's closing arguments amounted to ineffective assistance of counsel.  In rejecting Petitioner's claim, the Court of Appeal reasoned "the decision as to whether to object to statements in closing arguments is a highly tactical one" and therefore defense counsel may have strategically declined to object.  Ct. App. Op. at 31. In addition, the Court of Appeal found that the prosecutor's explanation of implied malice was not improper and therefore any objection by defense counsel would be unwarranted.  *Id.*  The Court of Appeal did not reach the prejudice prong, concluding that "the prosecutor's explanation of [the malice] standard was accurate and the failure of

---

[7] Defense counsel objected to this example and others the prosecutor used to explain the difference between involuntary manslaughter and second-degree murder, which the trial court overruled.  ECF No. 8-28 at 137.

[Petitioner's] defense counsel to object did not constitute ineffective assistance of counsel." *Id.* at 33.

Petitioner contends that the Court of Appeal mischaracterized California law in finding that the prosecutor's statements were not improper and that defense counsel had no reasonable strategic purpose in failing to object. ECF No. 2 at 45–48. Respondent maintains that the Court of Appeal's denial of Petitioner's ineffective assistance claim was correct, and that Petitioner could not establish prejudice in any case. ECF No. 7-1 at 33.

### 3. Analysis

The Court will consider whether the Court of Appeal's decision was contrary to, or an unreasonable application of *Strickland*, or whether it was based on an unreasonable determination of the facts. With respect to the prejudice prong of the *Strickland* test, the Court reviews the issue de novo because the Court of Appeal did not a pass on it. *See Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006).

#### i. Whether Prosecution's Argument was Legally Incorrect

Before assessing whether the failure to object rendered defense counsel's performance deficient, the Court "must determine 'whether the prosecutor's remarks constituted objectionable misconduct.'" *Demirdjian v. Gipson*, 832 F.3d 1060, 1067 (9th Cir. 2016) (quoting *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015)). The crux of Petitioner's argument is that the prosecution misstated the law in arguing that the mere negligent firing of a weapon, or any accidental firing while pointing a gun at the victim,[8] can suffice to show implied malice. ECF No. 2 at 48. "Obviously, a prosecutor should not misstate the law in closing argument." *United States v. Moreland*, 622 F.3d 1147, 1162 (9th Cir. 2010) (citation and internal quotation marks omitted). However, "AEDPA

---

[8] Petitioner argues that there is "no evidence" that Petitioner pointed the gun at the victim. ECF No. 2 at 47. But the prosecutor was permitted to argue that the jury should infer Petitioner pointed the gun at the victim before she shot him, which was supported by evidence that Petitioner shot the victim from a distance. ECF No. 28-7 at 35; *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) (noting that "prosecutors are free to argue reasonable inferences from the evidence").

1   . . . prohibits [the Court] from treating a prosecutorial statement as error if there is any

2   reasonable argument to the contrary." *Demirdjian*, 832 F.3d at 1067 (internal quotation

3   marks omitted).  Based on the above excerpts and the Court's reading of the closing

4   arguments as a whole, the Court finds that the prosecution did not suggest that mere

5   negligent firing of a weapon is sufficient and thus it was reasonable for the Court of

6   Appeal to conclude the prosecutor did not misstate the law.

7        Although the prosecutor did repeatedly state that an accidental killing can

8   demonstrate implied malice, he simultaneously qualified those statements by noting the

9   requirement that the defendant must have consciously disregarded human life.  ECF No.

10  8-27 at 63, 64, 66–67, 67–68, 70, 71, 77; ECF No. 8-28 at 115–16, 137–38; *see also* ECF

11  No. 8-27 at 58–59 (stating that "even accidental shootings can be second-degree murder

12  *under the circumstances that I'll show you in a moment*," before going onto explain

13  conscious disregard for human life) (emphasis added).  The prosecutor never suggested

14  that a mens rea of criminal negligence was sufficient to support a conviction for second-

15  degree murder.  Even an unintentional killing caused by "a willful act, the natural and

16  probable consequences of which are dangerous to human life, performed with conscious

17  disregard for that danger" can constitute second-degree murder under California law.

18  *People v. Lara*, 9 Cal. App. 5th 296, 315 (2017) (quoting *People v. Elmore*, 59 Cal.4th

19  121, 133 (2014)); *cf. People v. Swain*, 12 Cal. 4th 593, 603 (1996) (citation omitted)

20  ("[I]t is not necessary to establish that the defendant intended that his act would result in

21  the death of a human being."); *People v. McNally*, 236 Cal. App. 4th 1419, 1425 (2015)

22  (quoting *People v. Benitez*, 4 Cal.4th 91, 109–10 (1992)) ("Even if the act results in a

23  death that is accidental, as defendant contends was the case here, the circumstances

24  surrounding the act may evince implied malice.")

25       A more nuanced question is whether the prosecutor improperly suggested that

26  pointing a loaded firearm at another person necessarily shows implied malice.  As

27  Petitioner argues, in some circumstances, pointing a loaded weapon at another person

28  may be mere criminal negligence. *E.g.*, *People v. Velez*, 144 Cal. App. 3d 558, 566, n.7

(1983) (finding facts supported conviction for involuntary manslaughter where defendant pointed firearm at victim, even though he believed firearm was unloaded); *People v. Clark*, 130 Cal. App. 3d 371, 382 (1982), *abrogated by People v. Blakeley*, 23 Cal. 4th 82 (2000) (finding that under circumstances in which defendant testified "the gun just went off," jury could have properly found "the death was the result of the failure to exercise proper care under the circumstances" and thus supported conviction for involuntary manslaughter).  However, most of the prosecutor's arguments in his closing contended that pointing a loaded weapon in *this* circumstance, while Petitioner was in a heated argument with the victim, demonstrated a conscious disregard for human life.  *See* ECF No. 8-27 at 67–68, 70, 77; ECF No. 8-28 at 115–16, 137–38.  As the Court of Appeal noted, none of the authorities cited by Petitioner indicate that pointing a gun during a heated argument, particularly by someone who has experience with firearms and thus knows of the potential danger, can never indicate a conscious disregard for human life. *E.g.*, *People v. Carmen*, 36 Cal. 2d 768, 774–76 (1951) (finding defendant was entitled to involuntary manslaughter instruction because there was some evidence that suggested defendant shot only to frighten victim but stumbled, and noting whether acts amounted to negligence or malice was a question for the jury); *People v. Ramirez*, 91 Cal. App. 3d 132, 139–40 (1979) (evidence supported trial court's finding that defendant acted with criminal negligence while holding loaded gun with multiple people in close proximity).

Rather, whether the act of pulling a loaded firearm presents a sufficiently high danger to human life and reflects a conscious disregard for human life is context-specific and a question for the jury.  *E.g.*, *Benitez*, 4 Cal. 4th at 108 (circumstances leading up to the shooting—including defendant's argument with victim, retrieval of loaded handgun and ammunition, and drawing of the loaded handgun with his finger on the trigger as victim lunged towards him—could establish implied malice); *People v. Thomas*, 53 Cal. 4th 771, 814–15 (2012) (noting that even accepting defendant's argument that shooting was unintentional, implied malice could be inferred from defendant's action of placing gun against victim's head and threatening him); *McNally*, 236 Cal. App. 4th at 1425

(finding that jury reasonably found Petitioner guilty of second-degree murder for accidental shooting that occurred while defendant, an experienced firearms user, drunkenly brandished a pistol); *People v. Boatman*, 221 Cal. App. 4th 1253, 1263 (2013) (sufficient evidence supported second-degree murder conviction where defendant "jokingly" cocked hammer of gun back while pointing it at his girlfriend).  It was appropriate for the prosecutor to argue to the jury that Petitioner's actions demonstrated a conscious disregard for human life, an argument the jury was free to accept or reject based on the circumstances of the shooting.[9]  The Court therefore finds that it was not unreasonable for the Court of Appeal to conclude the prosecutor's argument, that pointing a loaded firearm at another person during a heated argument may demonstrate implied malice, was legally proper.

The most arguably misleading statement made by the prosecutor was his explanation that Petitioner was guilty of second-degree murder if she accidentally shot the victim because "she has a duty of care to every person in our society to not do dangerous things."  ECF No. 8-27 at 67–68.  This statement, taken alone, might have suggested that pointing a gun at someone demonstrates implied malice merely because it is dangerous.  However, this statement was immediately followed by the prosecutor's argument that Petitioner is guilty of second-degree murder for taking a gun out during a heated argument "*if* she chose to do so and she consciously disregarded human life."  *Id.* (emphasis added).

The Court therefore finds that the Court of Appeal's conclusion that the prosecutor did not misstate the law was not unreasonable.

\ \ \

---

[9] Although Petitioner argues that "[t]he probability that a person holding a firearm will [accidentally] discharge it is low," ECF No. 14 at 56, she also relied on a theory that even experienced handlers of firearms may unintentionally discharge them, particularly when under stress.  ECF No. 2 at 46.  The jury reasonably could have concluded that Petitioner knew taking the loaded gun out during a heated argument "was a highly dangerous act and [that she] acted in conscious disregard for life."  *McNally*, 236 Cal. App. 4th at 1425.

1    *ii. Whether Defense Counsel's Failure to Object was Objectively Unreasonable*

2          Petitioner also must show that defense counsel fell below an objective standard of

3    reasonableness in failing to object to the prosecutor's argument.  Petitioner contends that

4    there was no strategic reason for defense counsel's failure to object, and that defense

5    counsel's objection to other parts of the prosecutor's closing argument demonstrates that

6    his failure to object was not a strategic choice.

7          It is not professionally unreasonable to refrain from objecting when such objection

8    would lack merit.  *See Demirdjian*, 832 F.3d at 1073 (internal quotation marks and

9    citations omitted) ("Arguably none of the statements here was error—let alone egregious

10   error. In these circumstances, the state court could have concluded [defense counsel]

11   reasonably thought any objection would be meritless[.]").  Even where a prosecutor's

12   statements are objectionable, attorneys may fear that excessive objections may cause the

13   jury to "construe their objections to be a sign of desperation or hyper-technicality."

14   *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991).  "Because many lawyers

15   refrain from objecting during opening statement and closing argument, absent egregious

16   misstatements, the failure to object during closing argument and opening statement is

17   within the 'wide range' of permissible professional legal conduct."  *United States v.*

18   *Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15,

19   1993) (quoting *Strickland*, 466 U.S. at 689).  The prosecutor's statements here were at

20   most borderline misleading, not "egregious misstatements." *Id.*  Defense counsel's

21   failure to object was therefore not outside of the wide range of reasonable professional

22   assistance. *Cf. King v. Borg*, 21 F.3d 1113 (9th Cir. 1994) ("Considering the possible

23   tactical reasons underlying the failure to object and the objection's questionable potential

24   success, counsel's decision did not fall outside the range of reasonable assistance.").

25         The fact that defense counsel objected to other statements in the prosecutor's

26   closing does not compel a different conclusion.  Defense counsel objected to both the

27   prosecutor's reference to recklessness and the examples of involuntary manslaughter and

28   second-degree murder used by the prosecutor.  ECF No. 8-27 at 72–75; ECF No. 8-28 at

43

137.   Defense could have reasonably determined that the prosecutor's description of Petitioner "recklessly pointing a gun" was more legally questionable than his descriptions of implied malice as extending to accidental shootings, because it may have suggested that recklessness alone, without the requirement of a conscious disregard for human life, was sufficient for second-degree murder.  *Cf. Velez*, 144 Cal. App. 3d at 568 (noting that "an individual who engages in aggravated and reckless conduct is culpable under the law" for involuntary manslaughter).  Defense counsel may have reasonably concluded that this statement, along with the prosecutor's colorful examples illustrating the difference between second-degree murder and involuntary manslaughter, were more worth objecting to than the prosecutor's arguably oversimplified, but not clearly incorrect, description of implied malice.

Accordingly, the Court finds that the Court of Appeal's conclusion that defense counsel's performance did not fall below an objective standard of reasonableness was not based on an unreasonable application of *Strickland* or an unreasonable determination of the facts.

### iii. Whether Petitioner was Prejudiced

Ultimately, even if the Court of Appeal did unreasonably apply the first prong of *Strickland*, Petitioner cannot show that she was prejudiced by defense counsel's failure to object for much the same reason that the Court found Petitioner was not entitled to relief on the second ground of her Petition.  Contrary to Petitioner's argument, regardless of how many "pages" of argument he devoted to express malice versus implied malice, the prosecutor's primary theory was that Petitioner intentionally shot the victim.  ECF No. 14 at 49; ECF No. 8-27 at 64–67 (discussing evidence that shooting was intentional before turning to alternative theory of implied malice if a juror thought that the it "was, in fact, somehow an accidental shooting").  The fact that the jury found true the allegation that Petitioner had intentionally discharged a firearm confirms that the jury accepted the prosecutor's theory that the shooting was intentional and rejected Petitioner's claim that the shooting was accidental, which formed the basis for her involuntary manslaughter

theory. It is highly unlikely that the jury determined that Petitioner intentionally fired the gun but did not intend to kill the victim—a theory presented by no party.

Petitioner also contends that because the jury only considered the firearm enhancements after deciding that Petitioner was guilty of second-degree murder, finding the first firearm allegation true was a "slam dunk." ECF No. 9-1 at 28. But as Petitioner herself argues, the prosecutor had made clear that a defendant could be found guilty of second-degree murder even if the jury concluded she did not intentionally fire the weapon. Further, the prosecution explicitly told the jury that all would have to unanimously agree that "this was an express malice intentional murder" in order to find true the first firearm allegation. ECF No. 8-27 at 78. Unless the jury failed to actually consider the firearm allegations, the finding that Petitioner intentionally discharged a firearm in the commission of the murder necessarily means that the jury rejected the theory that Petitioner accidentally pulled the trigger, rendering irrelevant the question of whether an accidental shooting in these circumstances would show a conscious disregard for human life or mere criminal negligence. Additionally, the evidence that Petitioner acted with express malice was strong, as the prosecution presented significant evidence of Petitioner's actions after the shooting that were inconsistent with her claim that it was an accident. *See Strickland,* 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Thus, even if defense counsel had successfully objected to the prosecutor's statements regarding implied malice and accidental shootings, it would not have affected the jury's conclusion.

Therefore, Petitioner has not shown that there is a reasonable probability that the result would have been different but for defense counsel's failure to object.

The Court thus ADOPTS the Magistrate Judge's R&R, OVERRULES Petitioner's Objections to the R&R, and DENIES the relief with respect to the third ground stated in the Petition.

\ \ \

# V. CONCLUSION

After considering the Petition, the Answer, the Traverse, the R&R, the Objections in response to the R&R, and the lodgments and other documents filed in this case, as well as the legal arguments presented by both parties, and for all the foregoing reasons, the Petition is **DENIED.**

Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254 (West Supp. 2013). A certificate of appealability will issue when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253; *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, the Court concludes Petitioner has not made the required showing with respect to the second or third grounds of her Petition, and therefore a certificate of appealability with respect to those grounds is **DENIED**. However, the Court acknowledges that reasonable jurists may disagree with the Court's resolution of Petitioner's *Batson* challenges. The Court therefore **GRANTS** a certificate of appealability with respect to the first ground of the Petition.

**IT IS SO ORDERED.**

Dated: May 18, 2021

Hon. Gonzalo P. Curiel
United States District Judge